**STATE of Missouri, Respondent,**

v.

**Lemuel G. WILLIAMS, Appellant.**

**No. WD 75100.**

Missouri Court of Appeals, Western District.

July 9, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 27, 2013.

Application for Transfer Denied Oct. 29, 2013.

Jennifer Rodewald, Jefferson City, MO, for appellant.

Rosemary E. Percival, Kansas City, MO, for respondent.

Before Special Division: LISA WHITE HARDWICK, Presiding Judge, CYNTHIA L. MARTIN, Judge, and W. SUE DODSON, Special Judge.

LISA WHITE HARDWICK, Judge.

Lemuel Williams appeals from his conviction for first-degree robbery. On appeal, he contends the circuit court erred in giving the hammer instruction to the jury instead of granting his request for a mistrial after the jury indicated it was deadlocked. Williams also argues the evidence was insufficient to support his conviction under a theory of accomplice liability; the court erroneously allowed the State to present evidence of a prior uncharged crime; and the court plainly erred in instructing the jury on alternative theories of accomplice liability. For reasons explained herein, we affirm.

FACTUAL AND PROCEDURAL HISTORY

Late in the afternoon on November 16, 2009, a gold Pontiac Grand Prix pulled into the parking lot of a strip mall on North Oak in Gladstone. The car parked in front of an iTalk store. The iTalk store's video surveillance camera showed that, from 4:24 until 4:30 p.m. when the iTalk store closed, no one got out of the gold Pontiac.[1]

The iTalk store was located next to a PDQ Title Loans store. Savannah Waller–Hudson was working at PDQ Title Loans that day. Sometime around 4:40 p.m., she was talking on the phone to her supervisor, Lisa Boone, about the day's business when she saw a man walking

quickly toward her. The man was African–American and was wearing a black, pinstriped, button-up dress shirt with a black long-sleeved shirt underneath and black jeans. He was also wearing gold removable teeth and a black stocking cap. As he moved toward her, he pulled the stocking cap over his face.

The man demanded that Waller–Hudson get off the phone. Before hanging up, Waller–Hudson yelled at Boone to call 911. The man grabbed Waller–Hudson's shoulder and told her to get the cash out of the cash register. He then pulled her out of her chair, led her to the cash register, and opened it. As the man started to take the money out of the cash register, Waller–Hudson attempted to shut the drawer on his fingers. The man showed her the handle and part of the trigger of a gun that was in his pocket and told her, "I'm not doing this with you." He proceeded to take the money from the cash register and put it in his pocket.

When he was finished, he asked Waller–Hudson about the store's safe. When she told him the store did not have a safe, he led her into the employee bathroom and told her to lie face down on the floor. After she pleaded with him not to make her do that, he let her sit on the toilet instead. The man then left the store. Waller–Hudson waited two or three minutes before walking out of the bathroom. When she exited the bathroom, she saw that the police had arrived.

Meanwhile, after Waller–Hudson hung up on her, Boone immediately attempted to call her back, but the phone went straight to voicemail. Boone called Victor Caruso, the owner of PDQ Title Loans,

---

1. The camera was located in the back of the iTalk store and was pointed toward the front of the store. Because there was a window in the store's front entrance, the camera captured the view from that window to the park-

ing lot. When the store closed at 4:30 p.m., the window shades were closed, blocking the camera's view of the parking lot after that time.

and told him to check the store's camera. Caruso had a webcam set up in the store and pulled up the live feed on his computer in time to see the man grab Waller–Hudson's shoulder and lead her behind the cash register. Caruso called 911. He watched the man take Waller–Hudson out of the camera's view and into the back of the store. After a couple of minutes, Caruso watched as the man left the store. Caruso then saw Waller–Hudson come out from the back of the store and the police arrive. From the time Caruso first saw the man robbing the store until he saw the police, approximately ten minutes elapsed. Approximately five minutes elapsed between the time he saw the man exit the store and he saw the police arrive at 5:00 p.m.

The police were dispatched to the robbery at 4:56 p.m. The dispatch described the suspect as an African–American male, wearing a black shirt with pinstripes and possibly a black jacket and black hat. The dispatch also stated that the suspect had fled southbound on foot. One of the officers who responded was Captain Stanley Dobbins. On his way to the PDQ Title Loans store at approximately 5:00 p.m., Dobbins saw a gold Pontiac Grand Prix traveling southbound on North Oak, about four to seven blocks away from PDQ Title Loans. Dobbins saw two African–American men in the car. He noticed that the passenger was "scrunched down" in the seat, so he was unable to get a good look at the passenger at that time. Because Dobbins knew that a similar car was part of an investigation of another robbery at the same PDQ Title Loans store about a month earlier, he began to follow the car. Eventually, Dobbins pulled his car alongside the gold Pontiac Grand Prix and saw that the passenger fit the description of the suspect in the current robbery. Dobbins reported this to dispatch and waited for other officers to arrive before executing a traffic stop.

Upon stopping the car, the police learned that Williams was the driver and that Andre Williams ("Andre"), who matched the description of the robbery suspect, was the passenger. Initially, Andre gave the police several false names. Williams told Dobbins that he and Andre were just out driving around. Both Williams and Andre were arrested. Waller–Hudson was brought to the scene and identified Andre as the person who robbed PDQ Title Loans. As the police were booking Andre, he tried to hide a set of gold teeth in his hand.

When questioned by the police the day after the robbery, Williams said that he was from Jackson County, but his girlfriend lived in the Gladstone area and he stayed with her from time to time. He said that Andre was his cousin from Oklahoma, whom he had known for five years. Williams said that Andre had been in Kansas City for two months, and he was helping Andre get around town by driving him places. Williams told the police that he had recently taken Andre to buy a set of gold teeth.

Williams told the police that, on the day of the robbery, he arrived in Gladstone around 3:30 p.m. and picked up Andre. According to Williams, he and Andre drove to a CVS on Shady Lane and North Oak. After initially indicating it was a CVS, however, Williams said that it might have been a Walgreen's. Williams said that Andre waited in the car as he went inside the pharmacy for thirty minutes and bought lotion. After leaving the pharmacy, Williams drove on North Oak and pulled into the parking lot of a sub shop and CD store located on North Oak. Williams told the police that he had been to another CD store located on Antioch, but on the day of the robbery, he went

only to the CD store on North Oak. Williams said that he went into the sub shop, bought a cookie and a drink, and then went into the CD store. According to Williams, the clerk at the CD store had fluffy hair. Williams told the police that he was in the CD store for thirty minutes, while Andre stayed in the car. When he came out of the CD store, Andre was still in the car. Williams said that they left the parking lot and were pulled over shortly thereafter.

Williams denied any knowledge of the robbery and told the police that Andre must have taken his car while he was in the pharmacy or the CD store. Williams was confident that he could take the police to the stores he had been to that afternoon, so a detective drove him to North Oak to find the stores. They found a CD store on North Oak, but Williams said that was not the right store.

Later that day, the detective took Williams out again, but this time they drove on Antioch instead of North Oak. They found a CD Warehouse and a Mr. Goodcents on Antioch, and Williams identified both stores as the ones he had been in on the day of the robbery. When the detective showed the clerk at CD Warehouse a picture of Williams, however, the clerk said that he did not notice that Williams was in the store on the day of the robbery. The clerk did not have fluffy hair, and he said that no one who worked there had fluffy hair.

Upon searching the gold Pontiac Grand Prix, the police did not find the lotion that Williams claimed to have bought or the trash from Mr. Goodcents, which Williams said he put in a plastic bag in the car. Because Williams asserted that Andre must have taken the car and robbed PDQ Title Loans during the thirty minutes that he was inside CD Warehouse, the police timed how long it took to get from CD Warehouse to PDQ Title Loans. Driving the speed limit between 4:30 and 5:00 p.m. on the same day of the week as the robbery, it was a twelve-minute trip.

The State charged Williams with first-degree robbery for acting in concert with Andre to forcibly steal money from PDQ Title Loans. The first jury trial of the case ended in a mistrial due to juror misconduct. During the second trial, Williams testified in his defense. Williams testified that he was not the getaway driver in the robbery. He said that, on the day of the robbery, he picked up Andre in his girlfriend's gold Pontiac Grand Prix between 3:30 and 4:00 p.m. to run some errands. Williams testified that they first went to Walgreen's to buy lotion. He was in the store for thirty minutes, while Andre waited in the car. Williams could not remember whether he bought any lotion. Williams said that, after leaving Walgreen's, he drove to a strip mall on Antioch. According to Williams, he went to a Mr. Goodcents store and bought two cookies and a drink. He then returned to the car and moved the car in front of the CD Warehouse store that was in the same strip mall. Williams testified that he went into CD Warehouse for thirty minutes, leaving Andre in the car with the car keys. Williams said that, when he came out of the store, Andre was sitting on the hood of the car, smoking a cigarette. Williams testified that they drove around to look for another CD store, but when he could not find another CD store, he decided to return to CD Warehouse. According to Williams, he was on his way back to CD Warehouse when the police pulled him over.

The jury found Williams guilty of first-degree robbery. In accordance with the jury's recommendation, the court sentenced him to ten years in prison. Williams appeals.

## ANALYSIS

### *Hammer Instruction*

■ In Point I, Williams contends the court erred in overruling his request for a mistrial and giving the hammer instruction to the jury when the jury communicated that it was deadlocked. He argues that the instruction coerced a verdict in violation of his rights to a unanimous verdict, a fair trial, an impartial jury, and due process.

After deliberating for three hours, the jury sent a note to the court that read, "It's 11:1 and no jurors are budging. What is our next step? We have had numerous deliberations/discussions." The court noted that the jury had been out for three hours, counting lunch, and asked the parties for suggestions. The prosecutor responded that the jury had not been out "for very long yet," and that he would "hate to give up." Defense counsel responded, "Nothing at this time." The court mentioned that the hammer instruction was an option but said that three hours did not seem like "a huge amount of time" and that it would not give the hammer instruction unless both parties asked for it. Neither party asked for it, so the court sent a response to the jury that said, "Please continue your deliberations."

Four hours and thirty-six minutes into deliberations, the jury sent another note to the court that read, "We are still at 11:1 and no jurors are budging. We have been deliberating with no headway." When the court asked for the parties' thoughts, the prosecutor requested the hammer instruction. Defense counsel objected. The court said that it was reluctant to use the hammer instruction since part of the four hours and forty minutes of deliberations was spent eating lunch. Again, the court told the jury, "Please continue your deliberations."

Five hours and twenty-five minutes into deliberations, the jury sent another note that read, "We are still at 11:1 and the juror said she will not change her mind." The words "will not" were underlined three times. When the court asked the parties for their thoughts, the prosecutor asked that the court give the hammer instruction. Defense counsel requested a mistrial. After noting that this was the third note from the jury indicating that it was deadlocked and the State's second request for the hammer instruction, the court ruled that it would read the hammer instruction to the jury.

The court brought the jury into the courtroom and read it MAI–CR3d 312.10.[2] An hour and a half later, the jury returned its guilty verdict. On appeal, Williams argues the court's giving the hammer instruction served only to coerce the holdout juror to abandon her firmly-held belief that the State had not met its burden of proof.

■ The length of time that a jury is allowed to deliberate and the decision as to whether to give the hammer instruction are matters within the circuit court's discretion. *State v. Copple,* 51 S.W.3d 11, 14

---

2. MAI–CR3d 312.10 states:

You should make every reasonable effort to reach a verdict, as it is desirable that there be a verdict in every case. Each of you should respect the opinions of your fellow jurors as you would have them respect yours, and in a spirit of tolerance and understanding endeavor to bring the deliberations of the whole jury to an agreement upon a verdict. Do not be afraid to change your opinion if the discussion persuades you that you should. But a juror should not agree to a verdict that violates the instructions of the Court, nor should a juror agree to a verdict of guilty unless he is convinced of the defendant's guilt beyond a reasonable doubt.

(Mo.App.2001). To demonstrate an abuse of discretion, the appellant must show from the record that the jury's verdict was coerced. *Id.* In determining whether the hammer instruction coerced the jury's verdict, we consider several factors, including:

(1) the amount of time the jury deliberates before the instruction is given, (2) the amount of time that elapses between the reading of the instruction and the verdict, (3) whether the trial court knows numerically how the jury is split and the position of the majority, and (4) whether the giving of the instruction conforms with the Notes on Use.

*Id.*

Applying these factors, the jury deliberated for five hours and twenty-five minutes before the court gave the hammer instruction and another hour and twenty-three minutes after the court gave the instruction before reaching a verdict. When the jury initially notified the court that it was deadlocked, the court carefully considered other options and did not immediately give the hammer instruction. See *id.* at 15. In fact, the court waited to give the hammer instruction until after the jury's third deadlock notice. Several other cases have found that deliberations of similar or shorter time periods did not indicate coercion. See, e.g., *State v. Scott*, 348 S.W.3d 788, 798–99 (Mo.App.2011) (deliberation for four hours and fifty minutes before hammer instruction and thirty-nine minutes after); *State v. Carriker*, 342 S.W.3d 425, 427 (Mo.App.2011) (deliberation for three hours before hammer instruction and ten minutes after); *State v. Dodd*, 10 S.W.3d 546, 553 (Mo.App.1999) (deliberation for two hours and forty-seven minutes before hammer instruction and thirty minutes after). The amount of deliberation time before and after the giving of the hammer instruction in this case does not indicate that the jury's verdict was coerced.

Likewise, although the court knew the numerical split of the parties, this factor alone does not establish coercion. The jury volunteered the numerical split in its notes advising the court of the deadlock. "No error arises from the judge knowing this information alone when the communication from the jury is unsolicited and voluntarily given to the court." *Copple*, 51 S.W.3d at 14.

Lastly, the record indicates that the court followed the Notes on Use for MAI–CR 3d 312.10, as the court allowed counsel on both sides to make objections before giving the instruction; the court numbered, read, and submitted the instruction to the jury; and the court noted on the record the time that the jury first retired to deliberate, the time it gave the hammer instruction, and the time that the jury returned a verdict. Application of the relevant factors indicates that the court's giving the hammer instruction did not coerce the jury's verdict.

Williams argues, nevertheless, that the hammer instruction itself is coercive. He acknowledges that Missouri courts have expressly held to the contrary. Indeed, courts have repeatedly stated that " '[t]he [hammer] instruction itself is not coercive, as it urges frank and open discussion, tolerance, and the desirability of a unanimous verdict but cautions each juror against basing a verdict on evidence he does not believe is true.' " *State v. Jackson*, 896 S.W.2d 77, 80 (Mo.App.1995) (quoting *State v. Kinder*, 858 S.W.2d 838, 840 (Mo.App.1993)). See also *Copple*, 51 S.W.3d at 14; *Dodd*, 10 S.W.3d at 553. Moreover, the hammer instruction is an MAI instruction that was promulgated and approved by the Supreme Court. Hence, this court, like the circuit court, is bound by it "as surely as it is bound by Supreme Court

cases and rules." *Topper v. Midwest Div., Inc.,* 306 S.W.3d 117, 131 (Mo.App.2010) (internal quotation marks and citations omitted). The use of the hammer instruction did not coerce the jury's verdict, and the circuit court did not abuse its discretion in giving the instruction. Point I is denied.

### Sufficiency of Evidence of Accomplice Liability

In Point II, Williams contends the evidence was insufficient to support his conviction for first-degree robbery under a theory of accomplice liability. When reviewing a challenge to the sufficiency of the evidence, our role "is limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Crawford,* 68 S.W.3d 406, 408 (Mo. banc 2002). We consider the evidence and inferences in the light most favorable to the verdict, disregarding all contrary evidence and inferences. *Id.* at 407–08. We defer to the jury's credibility determinations, recognizing the jury was entitled to believe "all, some, or none" of the testimony of the witnesses. *Id.* at 408.

The State charged that Williams acted in concert with Andre when Andre robbed PDQ Title Loans. Section 562.041.1(2), RSMo 2000, states that a person is criminally responsible for another's conduct when "[e]ither before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense." "Any evidence, either direct or circumstantial, that shows affirmative participation in aiding the principal to commit the crime is sufficient to support a conviction." *State v. Smith,* 108 S.W.3d 714, 719 (Mo.App.2003). Affirmative par-

ticipation may be proven by inference, "and the evidence need not directly place the appellant in the act of committing the crime for which [the appellant] is charged." *Id.* Circumstances that may support the inference of an accomplice's affirmative participation include "presence at the crime scene; flight therefrom; association or companionship with others involved before, during, and after the crime; conduct before and after the offense; knowledge; motive; and a defendant's attempt to cover up his involvement." *Id.*

In this case, the evidence and reasonable inferences showed that Williams drove Andre to the crime scene and acted as the getaway driver after Andre committed the crime. The gold Pontiac Grand Prix that Williams was driving arrived in front of the strip mall in which PDQ Title Loans was located at 4:24 p.m. No one got out of the car until after 4:30 p.m. At approximately 4:40 p.m., Andre robbed PDQ Title Loans. Based upon Caruso's testimony that five minutes elapsed between the time that Andre left the store and the police arrived, and a police officer's testimony that he was the first officer on the scene at 5:00 p.m., the evidence showed that Andre left the store at 4:55 p.m. Five minutes after Andre left the store, Dobbins saw Williams driving the gold Pontiac, with Andre as the passenger, approximately four blocks away from PDQ Title Loans. From this evidence, the jury could reasonably infer that Williams drove Andre to PDQ Title Loans and waited in the car while Andre robbed the store.

Indeed, this is the only reasonable inference, because the evidence does not support Williams's version of events. Williams claimed that, while he was inside CD Warehouse from approximately 4:30 to 5:00 p.m., Andre must have taken the car, robbed PDQ Title Loans, and returned to CD Warehouse, where Williams found him

sitting on the hood of the car, smoking a cigarette. There was not enough time, however, between 4:55 p.m., when Andre left PDQ Title Loans, and 5:00 p.m., when Dobbins first saw Williams driving the gold Pontiac, for Andre to have driven back to CD Warehouse, gotten out of the car, sat on the hood, begun smoking a cigarette, gotten back into the car, and ridden with Williams to the location where Dobbins first spotted them. The evidence showed that it would have taken twelve minutes just for Andre to have driven from PDQ Title Loans to CD Warehouse. For Williams to have been in the car with Andre five minutes after the completion of the crime, approximately four blocks away from the crime scene, Williams had to have been in the car during Andre's commission of the crime. A reasonable inference is that Williams was in the car before, during, and after the robbery.

Williams's attempt to conceal his involvement in the robbery by providing exculpatory statements that later proved to be false further supports an inference of his affirmative participation in the crime. " '[E]xculpatory statements, when proven false, demonstrate consciousness of guilt.' " *State v. Tremaine*, 315 S.W.3d 769, 776 (Mo.App.2010) (citation omitted). Considering the distance between PDQ Title Loans and CD Warehouse and the timing of the robbery and traffic stop, Williams's

claim that Andre must have taken the car and robbed PDQ Title Loans without his participation is implausible.

The evidence also proved false Williams's claim that he and Andre were simply out running errands that included buying lotion at a pharmacy, buying cookies and a drink at Mr. Goodcents, and looking for a CD at a CD store. When the police stopped Williams, they found no lotion in the car and no trash from Mr. Goodcents, despite Williams's statement that he had discarded his trash from Mr. Goodcents in the car.[3] Williams had difficulty showing the police the pharmacy, the Mr. Goodcents store, and the CD store that he had allegedly visited. Additionally, although Williams claimed that he had been assisted by a clerk at CD Warehouse with fluffy hair, a CD Warehouse employee said that none of his coworkers had hair that fit that description.

When viewed in the light most favorable to the verdict, the evidence showed that Williams drove Andre to the scene of the crime, waited in the car while Andre committed the robbery, drove the getaway car for Andre after the robbery, and invented a false self-exculpatory statement to conceal his involvement. This was sufficient evidence from which a reasonable juror could find Williams's affirmative partic-

---

3. Williams asserts that the clerk at Mr. Goodcents "vouched" that Williams was in the store on the afternoon of the robbery as it was starting to get dark, which would have been the same time Andre was committing the robbery. According to Williams's trial testimony, however, he went to Mr. Goodcents first, then got back into the car with Andre and drove to CD Warehouse, where he left Andre in the car with the keys for thirty minutes. Pursuant to this testimony, Andre would not have had time to take the car and commit the robbery while Williams was in Mr. Goodcents and before Williams moved the car to CD Warehouse. Moreover, the clerk's testimony, when viewed in the light most favorable to the verdict, does not help Williams. The clerk testified that a man, who she was unsure was Williams, walked into her store and bought cookies and a drink in the early evening, between 5:00 and 6:00 p.m. Dobbins first spotted Williams and Andre at 5:00 p.m., several blocks away from Mr. Goodcents. A reasonable inference from the clerk's testimony is that she was mistaken either as to Williams's identity or as to the time of day that he was in the store. Either way, the evidence favorable to the verdict indicates that Williams was not in Mr. Goodcents at the time of the robbery.

ipation in the robbery beyond a reasonable doubt. Point II is denied.

### Evidence of Prior Uncharged Crime

■ In Point III, Williams contends the court erred in allowing the State to present evidence of a prior uncharged crime. Before the first trial, defense counsel moved to prohibit any evidence that, five weeks before the robbery, an African–American male robbed the same PDQ Title Loans and got into a gold Pontiac Grand Prix driven by a second African–American male. The court granted the motion.

Before the second trial, the State asked the court to reconsider this ruling. The State informed the court that, after the first trial ended in a mistrial, the State questioned the jury. A couple of the jurors indicated that they did not understand why the police stopped the gold Pontiac Grand Prix in the first place. The State said that it would like to present evidence that the police had a valid reason for stopping the car in connection with this robbery. Specifically, the State told the court that it wanted to ask Dobbins why he stopped the car, and it anticipated that Dobbins would testify that he stopped the car because a gold Pontiac Grand Prix "was associated with the robbery of the same store a month prior." The State assured the court that no witness would testify that Williams was involved in the prior robbery.

Defense counsel objected, arguing that the reason for the stop was irrelevant. Defense counsel also argued that the proposed testimony would constitute evidence of an uncharged crime because it implied that Williams was involved in the prior robbery, and its prejudicial effect outweighed its probative value.

The court ruled that it would allow the State to present the proposed testimony, explaining:

Now, to the State's motion, and I have thought about this a long time. I thought about it a long time after the first trial. I've thought about it over and over again since then. The testimony the State seeks does not, in this Court's opinion, implicate the defendant himself in a second robbery, or in any prior robbery, I should say.

It seems to me that it is the reason why the police are looking for that particular car, and there being no other justification for the stop. Certainly it put into one juror's mind that it was an illegal stop when, in fact, it was not. I think to be fair, the State needs to be able to put [on] some testimony, very limited in scope, as to why that vehicle was stopped.

From what I've heard, that has nothing to do with the defendant himself and, in fact, if I remember correctly from the first trial, the defense theory was that the cousin took the car without the defendant's knowledge while defendant was in the, I believe, a record store, and that's how this robbery was committed. The same theory could apply to a prior robbery just as easily as it could apply to this one.

I've heard nothing that indicates that the State intends to submit testimony that there ... were two robbers involved in a prior robbery, or anything of that nature, and I won't allow it. I will limit the State to exactly what we've just discussed, that there was video of a gold Pontiac ... Grand Prix ... leaving the parking lot at, or near, immediately following, however, you want to phrase it, a robbery of that store, and that is why on this second occasion, subsequent occasion, however you want to phrase it, the police were looking for that type of vehicle.

... This is just about a car and why the police stop a car after a robbery. I think that's vitally important. So for that limited purpose, it will be granted.

The State also received the court's permission, over defense counsel's objection, to elicit from Waller–Hudson that the store was previously robbed.

During the trial, Waller–Hudson testified that she had been working in the store when it was robbed five weeks earlier. Dobbins testified that, when he was on his way to the scene of the robbery, he spotted a gold Pontiac Grand Prix. He further testified that, based upon his recollection of pending cases, a similar car was part of an investigation of another robbery at the PDQ Title Loans store about a month earlier. Defense counsel objected to the admission of all of this evidence and included the objections in his motion for new trial.

 The circuit court has broad discretion to admit or exclude evidence at trial. *State v. Kemp*, 212 S.W.3d 135, 145 (Mo. banc 2007). We will reverse the court's ruling only if we find an abuse of discretion. *Id.* An abuse of discretion occurs when the ruling is " 'clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration.' " *Id.* (citation omitted).

 Evidence of uncharged misconduct is inadmissible for the purpose of showing the defendant's propensity to commit crimes. *State v. Jackson*, 228 S.W.3d 603, 606 (Mo.App.2007). Such evidence may be admissible, however, to explain an officer's conduct in arresting the defendant. *Id.* For example, in *Jackson*, this court held that evidence of the defendant's involvement in a prior burglary was admissible in his trial for first-degree tampering to explain why the police were chasing the defendant in a truck that had

not yet been reported stolen. *Id.* Likewise, in *State v. Campbell*, 147 S.W.3d 195, 206 (Mo.App.2004), the court held that evidence of the defendant's outstanding unrelated arrest warrant was admissible in his trial for possession of marijuana with intent to distribute to explain why he was under police surveillance when he committed the charged crime.

In this case, the contested evidence was relevant to explain why the police followed and eventually stopped Williams and Andre. The police dispatch said that the robbery suspect had fled on foot. If the State did not explain Dobbins's reason for following the gold Pontiac Grand Prix instead of continuing to look for the robbery suspect on foot, the jury would be left to wonder, as did a couple of the jurors in the first trial, why the police chose to stop Williams and Andre. See *id.* To explain to the jury that there was a lawful reason for the stop, the State elicited very brief testimony from Waller–Hudson that the store had been robbed five weeks earlier and from Dobbins that a "similar car" was "part of an investigation" of a robbery at the PDQ Title Loans store a month earlier.

 Williams argues that the prejudicial effect of such evidence outweighed any probative value. We disagree. Waller–Hudson did not associate Williams in any way with the prior robbery, and Dobbins did not state that Williams had committed or was accused of committing the prior robbery. At most, Dobbins's testimony associated the gold Pontiac Grand Prix with the investigation of the prior robbery. While there was evidence that items belonging to Williams were found in the car and that Williams's girlfriend had asked him to get insurance quotes because she was letting him drive the car, the car belonged to Williams's girlfriend. According to Williams, his girlfriend also let An-

dre drive the car. To constitute evidence of uncharged crimes or misconduct by the accused, " 'the evidence must show the accused committed, was accused of, was convicted or, or was definitely associated with, the other crimes or misconduct.' " *State v. Bolds,* 11 S.W.3d 633, 638 (Mo.App.1999) (citation omitted). "Vague references are not characterized as clear evidence associating a defendant with other crimes." *Id.*

Moreover, although Williams claims that the prosecutor "stressed the evidence multiple times," the testimony about the prior robbery consisted of a single question and a single answer from Waller–Hudson, which did not mention the car, and a single question and answer from Dobbins. Outside of the one question to Dobbins, all other references to a gold Pontiac Grand Prix were in connection with the current robbery, not the prior robbery. The State did not argue the prior robbery as evidence of Williams's propensity to commit crimes. In fact, the State did not even mention the prior robbery in its closing argument. We cannot say that the court abused its discretion in admitting this evidence. Point III is denied.

### Instructional Error

In Point IV, Williams contends the court plainly erred in instructing the jury that it should find him guilty if he "acted together with or aided" Andre in committing the robbery. Williams argues the instruction was improper because instructing the jury in the disjunctive on alternate theories is appropriate only when there is substantial evidence to support each alternative, and there was no evidence that Williams "acted together" with Andre in committing any conduct elements of the robbery.

Williams concedes that he failed to specifically object to the instruction at trial. He requests plain error review under Rule 30.20. Plain error will be found only where the alleged error "demonstrates on its face substantial grounds for believing that manifest injustice or miscarriage of justice has occurred." *State v. Biggs,* 170 S.W.3d 498, 503 (Mo.App.2005).

Williams's allegation of error concerns the verdict director for first-degree robbery. It was patterned after MAI–CR3d 304.04 and provided:

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about November 16, 2009, in the County of Clay, State of Missouri, Andre Williams took money, which was property in the possession of PDQ Title Loans, and

Second, that Andre Williams did so for the purpose of withholding it from the owner permanently, and

Third, that Andre Williams in doing so threatened the immediate use of physical force on or against Savannah Waller–Hudson for the purpose of preventing resistance to the taking of the property, and

Fourth, that in the course of taking the property, Andre Williams displayed or threatened the use of what appeared to be a deadly weapon,

then you are instructed that the offense of robbery in the first degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fifth, that with the purpose of promoting or furthering the commission of that robbery in the first degree, the defendant *acted together with or aided* Andre Williams in committing that offense, then you will find the defendant guilty under Count 1 of robbery in the first degree....

(Emphasis added.)

Williams challenges the use of the phrase "acted together with or aided" in

the fifth paragraph because the evidence showed that Andre alone committed all of the conduct elements of first-degree robbery. He correctly points out that Notes on Use 5(a) for this instruction directs that, where the evidence shows that the conduct elements of the offense were committed entirely by someone other than the defendant and the sole basis for the defendant's liability is his aiding the other person, the instruction should use the phrase "aided or encouraged" in that paragraph instead of the phrase "acted together with or aided." [4]

■■■ The circuit court erred in giving the instruction in violation of the Notes on Use under MAI–CR. *State v. Young,* 369 S.W.3d 52, 56 (Mo.App.2012). The prejudicial effect of such error is to be judicially determined. *Id.;* Rule 28.02(f). Because Williams is entitled to only plain error review, prejudice will be found only if the error so misdirected or failed to instruct the jury that it is evident that the instructional error affected the jury's verdict. *State v. Baker,* 103 S.W.3d 711, 723 (Mo. banc 2003).

To support his claim of prejudice, Williams relies heavily on *State v. Puig,* 37 S.W.3d 373 (Mo.App.2001). In *Puig,* the verdict director for the sale of a controlled substance required the jury to find that the defendant's accomplice sold the marijuana but also instructed the jury that it could find the defendant guilty if he "acted together with or aided" his accomplice. *Id.* at 376–77. The court found that the instruction was erroneous because there was no evidence that the defendant committed a conduct element of the offense; therefore, there was no evidence that the defendant "acted together with" the accomplice. *Id.* at 377.

The court found that the defendant was prejudiced by the disjunctive submission because the prosecutor had argued to the jury that the defendant "acted together with" his accomplice by urging the undercover officers to buy marijuana from his accomplice—a fact that was not in evidence. *Id.* at 378. Thus, the court noted that some of the jurors may have relied on the prosecutor's erroneous argument and decided the defendant's guilt based on "acting together," while disregarding the correct basis for guilt, which was that the defendant "aided" his accomplice by delivering a scale to him. *Id.* Because the evidence did not support that the defendant "acted together with" the accomplice and there must be evidence to support each alternative in a disjunctive submission, the court found that "the prosecutor's argument, without evidentiary support, had the effect of misleading the jury." *Id.*

After *Puig,* however, this court addressed the same issue and found that *Puig*'s conclusion about the disjunctive submission was "uniquely problematic" when applied to instructions for accomplice liability. *Biggs,* 170 S.W.3d at 504. In *Biggs,* this court explained that, to find the defendant guilty based upon accomplice liability, "a jury must unanimously agree as to the fact of guilt," but "the jury need not agree to the means by which a crime was committed." *Id.* at 504–05. Indeed, whether the defendant "committed all, some, or none of the conduct elements is irrelevant," because the defendant is guilty of the charged crime whether he aided or acted together with the accomplice. *Id.* at 505. This court determined that, "[w]hile circumstances may occur in which alternative theories of accomplice liability could

---

4. According to MAI-CR3d 304.04 Notes on Use 5(c), the phrase "acted together with or aided" is appropriate where the evidence is unclear or conflicting as to whether the defendant or another person engaged in the conduct elements of the offense.

require a different quantum of evidence to support them (such as theories evincing different states of mind), usual theories of aiding and abetting do not include such issues." *Id.* Thus, this court found that the instruction did not result in manifest injustice or miscarriage of justice because the evidence showed that the defendant associated himself with and participated in the crime by providing his accomplice with a gun and driving the getaway vehicle. *Id.*

The Eastern District of this court also recently addressed the issue in *Young*, 369 S.W.3d 52. In discussing whether prejudice resulted from the instruction's erroneously using "acted together with or aided" instead of "aided or encouraged," the court noted that "an ordinary juror would have no understanding of the legal principles underlying conduct elements or intent elements of a crime." *Id.* at 58 (citing *State v. Galbreath*, 244 S.W.3d 239, 252 (Mo.App. 2008)). Because the terms "acted together with" and "aided" were not defined for the jury, the court found that, under the facts of the case, "an ordinary juror would see no distinction between the two terms and would treat them as functionally equivalent." *Id.* The court explained that, "[i]n ordinary language, when we think of 'aiding' someone, we likely think of 'acting together with' him or her. Likewise, when we think of 'acting together with' someone, we likely think of 'aiding' that person." *Id.* Given the defendant's affirmative participation with the other man in committing the crime, which a reasonable juror applying the phrases' ordinary meaning could deem to be either "acting together with" or "aiding," the court concluded that it had "no reason to believe that the jurors drew such a fine legal distinction between the terms 'acted together with' and 'aided.'" *Id.* The court held that, "without such a fine legal distinction, the defendant's claim of prejudice cannot be demonstrated." *Id.*

In this case, Williams argues that he was prejudiced because the prosecutor, on multiple occasions, argued to the jury that he "worked with" or "acted with" Andre in committing the crime. Specifically, Williams notes that the State argued that he "worked with" Andre by providing local knowledge of the area, which he used to help plan the crime, to decide which route to take from PDQ Title Loans, and to determine where to "ditch the money" after the robbery. Williams contends that, like the prosecutor's argument in *Puig*, there was no evidence to support any of this argument; therefore, the jury may have erroneously convicted him because it believed that he "acted together with" Andre based upon the prosecutor's unsubstantiated argument.

Unlike in *Puig*, the prosecutor's argument in this case was not unsubstantiated. Although Williams testified that he was not familiar with the Gladstone area, the evidence showed that he stayed at his girlfriend's apartment in Gladstone from time to time and frequently drove her car around the area. Also, he indicated to the police that he knew where some of the city's major streets and businesses were located. Andre, on the other hand, had been in town for only two months and depended upon Williams to drive him around. The prosecutor's argument, that Williams used his knowledge of the area to help Andre commit the robbery, was a reasonable inference from the evidence.

That the prosecutor used the phrase "acted with" instead of "aided" did not serve to mislead or confuse the jury. It was clear that the prosecutor was not arguing the technical distinction between the two phrases, i.e., that Williams "acted with" Andre by personally committing the conduct elements of the robbery and also "aided" Andre by helping him commit the

robbery. Rather, the prosecutor used the phrases interchangeably to describe evidence that constituted what the *Puig* court would have defined as Williams's acts of "aiding" Andre—providing local knowledge of the area and driving Andre to and from the robbery scene.[5]

Williams contends, however, that the jury's confusion from the erroneous verdict-directing instruction was apparent based upon a note that it sent the court during deliberations. In the note, the jury asked for clarification of language contained in another instruction. The other instruction, which also discussed accomplice liability, was patterned after the opening paragraph of MAI–CR3d 304.04 and was appropriately given as a separate instruction pursuant to Notes on Use 3. It provided:

> A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with the other person with the common purpose of committing that offense or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.

The jury's note sought clarification of the language, "he aids or encourages the other person in committing [the crime]." The jury also asked, "What if [the] person does not know [a] crime has been committed, but [is] driving [the] getaway car[?]"

Notably, while the instruction that is the subject of the jury's note discusses a person's responsibility for both "acting with" and "aiding or encouraging," the jury asked for clarification of only the "aids or encourages" language. Thus, rather than demonstrate that the jury was confused by the verdict-directing instruction's erroneous use of the phrase "acted together with," the note shows that the jury understood that, before it could find Williams guilty, it had to decide whether he *aided* or *encouraged* Andre in committing the robbery. The jury's note simply indicates that it was unsure, at that point in its deliberations, whether Williams's driving the getaway car was sufficient evidence of aiding or encouraging.

Williams has failed to demonstrate that the erroneous verdict-directing instruction so misdirected or failed to instruct the jury that it is evident that the error affected the jury's verdict. Therefore, he has not

---

5. Williams also argues that the prosecutor misled the jury by arguing that Williams himself committed the conduct elements of the robbery and that he "acted with" Andre:

> The defendant took money in possession of PDQ Title Loans. He did it to permanently withhold it. He threatened immediate physical use of force to prevent resistance, and he displayed what appeared to be a deadly weapon, and the defendant did this to further the robbery by acting with his cousin.

The prosecutor made these statements at the end of her opening argument, and Williams did not object to them. It is unclear from the transcript whether the prosecutor simply misspoke or whether she was referring to Williams's responsibility for Andre's conduct in committing the robbery. In any event, we do not find that the jury was misled. Earlier in her opening argument, the prosecutor went over the conduct elements of the robbery in detail and expressly advised the jury that the State was required to prove that Andre committed each of them. The verdict director also advised the jury that it was to determine whether Andre committed the conduct elements of the robbery. Additionally, the prosecutor explained to the jury that Williams could be held responsible for Andre's conduct because, under Missouri law, a person is responsible for another person's conduct if they are "working together to commit a crime," or "encouraging each other" or "helping each other." As we discuss *infra,* the jury's note to the court shows that the jury was aware that, based upon the evidence presented, it needed to decide whether Williams aided or encouraged Andre in Andre's commission of the robbery.

established that he suffered manifest injustice or a miscarriage of justice entitling him to plain error relief. Point IV is denied.

### CONCLUSION

We affirm the circuit court's judgment.

ALL CONCUR.