STATE of Missouri, Plaintiff-Respondent,

v.

Brent Dewayne BLACK, Defendant-Appellant.

No. SD 34310

Missouri Court of Appeals, Southern District, Division One.

Filed: July 25, 2017

---

SAMUEL E. BUFFALOE and EM-
METT D. QUEENER, Columbia, MO, for
Appellant.

DORA A. FICHTER, Jefferson City,
MO, for Respondent.

DON E. BURRELL, J.

A Pulaski-County jury found Brent De-
wayne Black ("Defendant") guilty of child-
abuse and murder in the second degree for
killing his girlfriend's infant child ("Child")
in January 2013.[1] For those crimes, Defen-

---

1. *See* sections 565.021.1(2), RSMo 2000, and
568.060.2(1), RSMo Cum. Supp. 2012. The
case was tried in Pulaski County following a
change of venue from Phelps County. All rule
references are to Missouri Court Rules (2017).

dant was sentenced to consecutive terms of, respectively, 12 years and life in prison.

Defendant's first two complaints on appeal are unpreserved because he has failed to demonstrate that they were set forth in a timely-filed motion for new trial or judgment of acquittal. They are: (1) the trial court abused its discretion in permitting a doctor to testify about "her findings and medical opinion of [Child's] injuries" because "the testimony was repetitive, cumulative, bolstering and prejudicial" in view of another physician's testimony; and (2) the trial court erred in giving the "'hammer'"[2] instruction because it "coerced the jurors to return a verdict of guilty when they indicated that they were unable to unanimously reach a verdict." Our discretionary review of these unpreserved claims reveals no error, plain or otherwise.

Defendant's third point, however, appropriately challenges the validity of the written judgment's imposition of a 99-year sentence for murder in the second degree instead of the life sentence orally pronounced by the trial court at Defendant's sentencing hearing. We therefore affirm Defendant's convictions and his 12-year sentence for child abuse. We remand the matter for the trial court to correct the written judgment of conviction and sentence to impose a life sentence for second-degree murder.

### Applicable Principles of Review and Governing Law

■ "Generally, it is within the trial court's sound discretion to admit or exclude an expert's testimony." *State v. Bowman*, 337 S.W.3d 679, 690 (Mo. banc

2011). The trial court has discretion over "[t]he length of time that a jury is allowed to deliberate[,]" *State v. Williams*, 409 S.W.3d 460, 466 (Mo. App. W.D. 2013), and "the decision to use the hammer instruction lies within the discretion of the trial judge." *State v. Fassero*, 256 S.W.3d 109, 116 (Mo. banc 2008).

■ Rule 27.07(c) requires a motion for acquittal to be filed "within fifteen days after the return of the verdict or the jury is discharged." Rule 29.11(b) requires a motion for new trial to be filed "within fifteen days after the return of the verdict." If these mandatory time limits are not met, nothing is preserved for appellate review. *State v. Lubbers*, 81 S.W.3d 156, 160 (Mo. App. E.D. 2002). In such a circumstance, we may consider an appellant's "allegations only as to issues deemed plain error." *Id.*

■ "The failure to accurately record the trial court's sentence as orally pronounced in open court is a clerical error." *State v. Burns*, 478 S.W.3d 520, 527 (Mo. App. E.D. 2015). In such cases, this court may remand the cause to the trial court to correct the written judgment. *See State v. Clark*, 494 S.W.3d 8, 14 (Mo. App. E.D. 2016).

### Evidentiary and Procedural Background[3]

Child was born in February 2012. On the evening of January 25, 2013, Child's mother ("Mother") went to Child's room in their Rolla apartment around 8:45 or 9:00 p.m. to put Child to bed. Child was "fussing[,]" and Mother gave her a bottle. Child

---

2. The prosecutor and defense counsel stipulated that Instruction No. 11 was "consistent with MAI-CR 312.10." The instruction set forth in MAI-CR 3d 312.10 is "commonly called the 'hammer' instruction." *State v. Burns*, 808 S.W.2d 1, 5 (Mo. App. E.D. 1991).

3. Defendant does not challenge the sufficiency of the evidence supporting his convictions, and our summary of the evidence relevant to the resolution of Defendant's points is of that "most favorable to the jury's verdict." *State v. Wright*, 247 S.W.3d 161, 163 (Mo. App. S.D. 2008) (quotation omitted).

eventually fell asleep at "[a]round 11[,]" and Mother went to bed. Defendant, Mother's boyfriend, remained "[i]n the living room watching TV." Before she went to bed, Mother did not see any bruises on Child's forehead. Child did have a "busted lip" from a previous incident Defendant had told Mother about, but Child's "frenulum . . . . wasn't detached. Just a busted lip."

Defendant later gave the following account of what took place that night to Rolla Police Detective Robert Derrick Jones. "About two in the morning, [Defendant] heard [Child] crying. He went in and gave her a bottle. He believed he changed her diaper. Laid her back down in the crib. He went back into the bedroom and was watching TV." After about an hour, Defendant "heard [Child] making some babbling sounds and coughing. He didn't think anything much about that because [Child] apparently had a cold previous to that." When Defendant checked on Child again a few minutes later:

> She was blue. He checked with his finger to see if there was anything in her mouth. He didn't see anything, but he felt something. He tried to get it out with his finger and every time he tried to get it out, it went further into her mouth.
>
> So he remembered there was a Leatherman. He looked for the Leatherman. Found it in the kitchen, came back and removed · the baby wipe, performed CPR. And he picked the baby up and was going into the master bedroom to wake [Mother] up and he fell.

A neighbor, Chester Schlichter, whose apartment was on the other side of a wall of Mother's apartment, heard Child crying that night, but Child eventually stopped. "[A]round the time [Child] stopped crying[, he] heard like a thud."

Mother awakened to Defendant standing in the bedroom doorway with Child in his arms and saying, "Babe! Babe! Wake up! She's not breathing." Defendant then called "911" from a neighbor's apartment.

A paramedic, Lisa Steelman, arrived and found that Child had "[n]o breathing, no pulse" as she carried Child to the ambulance. Ms. Steelman had no difficulty intubating Child, and Ms. Steelman did not injure Child's throat, tongue, or mouth while doing so. Child's pulse returned as they arrived at the hospital. An "EMT," Jonathan Woolley, "noticed a large bruise on the forehead of [Child]" after Ms. Steelman carried Child into the ambulance. Child was eventually air-lifted to a hospital in St. Louis. After a "brain death examination" indicated that "[t]here was no brain function[,]" life support was removed, and Child "passed away" on January 28, 2013.

On November 25, 2015, twenty days after the jury rendered its guilty verdicts, Defendant filed a "MOTION FOR JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT OF THE JURY OR, IN THE ALTERNATIVE, FOR A NEW TRIAL" ("the post-trial motion"). The post-trial motion included Defendant's challenge to the admission of Dr. Atzemis's testimony and the giving of the hammer instruction. The record does not indicate that a motion for extension of time to file the post-trial motion was either sought or granted.

At Defendant's sentencing hearing, without making any comment regarding its timing, the trial court denied the post-trial motion and pronounced the following sentence: on Count 1, felony child abuse, "12 years"; on Count 2, murder in the second degree, "life imprisonment. . . . [t]hat shall run consecutively to Count [1.]" Despite this pronouncement, the written judgment that followed reflected a 12-year sentence on Count 1 but described the sentence on Count 2 as "99 Years[.]"

This appeal timely followed the entry of the written judgment. Other evidence and background relevant to the resolution of Defendant's claims will be presented in our analysis of his points.

### Analysis

#### Point 1—Admission of Dr. Atzemis's Testimony

Dr. Adrienne Atzemis was allowed to give opinion testimony at trial over Defendant's objection that her testimony would "be cumulative evidence with the testimony" from Dr. Mary Case, who had not yet testified at the time Dr. Atzemis was called as a witness.[4] Dr. Atzemis, a board-certified "child abuse pediatrician," had been called in "by the [hospital] trauma team and asked to be a consultant" on Child's care. Dr. Atzemis reviewed Child's medical records and examined Child on January 26, 2013 in the intensive care unit. Child's condition was "[c]ritical, very grave." Child was not responsive, she was not breathing on her own, and she was incapable of independently maintaining a heartbeat. Child had "[m]ultiple bruises [and] contusions" on her head and face, including one on her forehead that indicated "multiple impacts to her head." A CAT scan and x-rays of the right side and back of Child's head showed swelling that also indicated "multiple impacts[.]"

A CAT scan of Child's brain showed a bilateral subdural hematoma—"a collection of blood in the layers of the outside of her brain." Dr. Atzemis opined that "[a]cceleration-deceleration rotational trauma"—movement that started fast or stopped fast and went in the direction of a circle or arc—was the cause of the subdural hematoma. Symptoms from such an injury would have been immediate, "generally start[ing] with becoming unconscious, ei-ther being very, very tired, not being able to act like themselves, not being able to do the things they normally do, and then very quickly after that becoming unconscious and not regaining consciousness." Dr. Atzemis opined that "abusive head trauma. . . . by another person" was the mechanism of Child's death. Dr. Atzemis also opined that "[s]omeone forced [Child] to stop breathing[.]"

The Chief Medical Examiner for St. Louis County, Dr. Mary Case, performed the "post-mortem examination" of Child on January 30, 2013.[5] Dr. Case opined that it was "not possible" for someone Child's age to "have swallowed a baby wipe" on her own. Dr. Case explained that it would be difficult for anyone to actually swallow a baby wipe, "unless you wadded it up[,]" and that "means that another person has done that" because "[a]n 11-month-old child does not have the finger dexterity to . . . push that wipe into the airway." Dr. Case maintained the same opinion as to the "portion of the baby wipe" shown to her as a part of the investigation.

Dr. Case's examination of Child's body revealed multiple bruises on her face and head and inside her mouth and throat. Child also had "a tear of the upper frenulum" in addition to a tear inside her lower lip. Based upon her experience, including following up on cases where "resuscitation is done by very inexpert people that have no idea what they're doing[,]" Child's injuries were not of the type that might result from "resuscitative efforts or intubation." From making incisions on Child, Dr. Case discovered that Child also had "subgalia hemorrhages" showing "six areas of impact" on the head that could "also be seen on CT scan[,]" along with a "fresh" skull fracture. Such a fracture of a young child's

---

4. Defendant also included this objection in a motion in limine denied by the trial court.

5. Defendant did not object to the State calling Dr. Case as a witness.

skull could have been made using "a forceful [hand-]strike."

Inside the skull, Child also had subarachnoid and subdural hemorrhages that Dr. Case believed were caused by "acceleration/deceleration." Dr. Case also observed retinal hemorrhages inside Child's eye. Those hemorrhages were also consistent with the "rotational acceleration/deceleration injury" characterized by Dr. Atzemis. The subarachnoid and subdural hemorrhages resulted in tears or damage to axons in Child's brain that caused unconsciousness and loss of breathing, which caused further damage to the axons from "hypoxia, the lack of oxygen[.]"

Dr. Case opined that the cause of Child's death was "head injury" to "the brain and the skull[.]" She opined that the mechanism of death was "multiple impacts and that one or more of those impacts caused very forceful movement of her head and created inertial brain injury that tore brain vessels, as well as brain tissue." Dr. Case thought that Child would have been rendered "immediately unconscious" from the injury to her brain. Finally, she opined that "[i]t was not an accidental death."

 Defendant's challenge to Dr. Atzemis's testimony was included in the post-trial motion, but the record does not demonstrate that the motion was timely filed. *See* Rules 27.07(c) and 29.11(b). The docket, transcripts, supplemental legal file, and the post-trial motion itself make no reference to a discharge of the jury later than the date on which it returned its verdict on November 5, 2015. And the record does not contain any indication that the trial court granted the allowable ten-day extension. "It is an attorney's obligation to ensure that an application for an extension of time is timely ruled upon by the court[,]" *State v. Jones*, 643 S.W.2d 34, 36 (Mo. App. E.D. 1982) (reviewing Rule 29.11), and "[i]t is appellant's responsibility to prepare a complete record on appeal."

*State v. Dunn*, 817 S.W.2d 241, 244 (Mo. banc 1991).

 Neither party has addressed this issue, but even if "the state did not question whether [d]efendant preserved her claims of error for review, noncompliance must be raised *sua sponte* by the appellate court because neither the court nor the parties can waive its requirements." *Lubbers*, 81 S.W.3d at 160; *see also State v. Ess*, 453 S.W.3d 196, 201 (Mo. banc 2015) ("[g]enerally, the circuit court has no authority to waive or extend the time for filing a motion for new trial beyond the time set forth in Rule 29.11(b)"). Because appellant has failed to demonstrate that the post-trial motion was timely-filed, our review is limited to plain error. *See Lubbers*, 81 S.W.3d at 160.

 "We are not required to review for plain error; to do so is within our discretion." *State v. Smith*, 293 S.W.3d 149, 151 (Mo. App. S.D. 2009). Plain error review requires the existence of "substantial grounds for believing that manifest injustice or miscarriage of justice has occurred." *State v. Shaffer*, 251 S.W.3d 356, 358 (Mo. App. S.D. 2008). "On direct appeal, plain error can serve as the basis for granting a new trial only if the error was outcome-determinative." *State v. Bartlik*, 363 S.W.3d 388, 391 (Mo. App. E.D. 2012). "In the absence of an error of this magnitude, no manifest injustice or miscarriage of justice exists and the appellate court should decline to exercise its discretion to review the claim of plain error pursuant to Rule 30.20." *Shaffer*, 251 S.W.3d at 358.

 Here, in addition to the fact that Defendant has not requested plain-error review, Dr. Atzemis's testimony, which was allegedly "repetitive [and] cumulative" to other unobjected-to testimony, cannot have been outcome determinative.

A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence. *State v. Barriner*, 34 S.W.3d 139, 150 (Mo. banc 2000) (quotation omitted). Evidence which is "cumulative merely" to "other competent testimony" is "not prejudicial." *State v. Williams*, 448 S.W.2d 865, 869 (Mo. 1970). Point 1 is denied.

### *Point 2—The Hammer Instruction*

The transcript does not record the precise time that the jury began its deliberations, but all such deliberations were concluded that same day. After sending the jury to deliberate, the trial court first went back on the record at 2:55 p.m. to present the parties with the following question from the jury: "What is the process if we cannot come to a conclusion?" Defense counsel stated that he was "fine with" the reply given to the jury by the trial court, which said: " 'The jury will refer to the instructions given and proceed with the deliberations.' " [6]

The trial court went back on the record at 3:24 p.m. and reported another question from the jury: "Are we allowed to go outside for a smoke/fresh air break?" Defense counsel had no objection to allowing a break.

At 3:50 p.m., the trial court went on the record to address additional questions from the jury. The trial court remarked, without any contradiction by the lawyers, that the jury had "been out almost two hours" at that time. The jury had asked: " 'Could we please look at the photos submitted into evidence?' " Counsel for the parties agreed on the exhibits to be sent to the jury in response to this question. The jury also asked: " 'Could you please lower the temperature?' " Without objection, that request was granted.

The trial court had "another question from the jury at 4:02 p.m.": " 'Are we allowed to use personal past experience and knowledge to deliberate the case?' " Defense counsel did not object to the trial court's response: " 'You are to be guided by the instructions previously given and continue your deliberations.' "

At about 4:30 p.m.,[7] the jury sent out the question: " 'We have referred to the instructions given, and we cannot reach a consensus. Where do we go from here?' " The trial court responded by reading the hammer instruction to the jury:

You should make every reasonable effort to reach a verdict, as it is desirable that there be a verdict in every case. Each of you should respect the opinions of your fellow jurors as you would have them respect yours, and in a spirit of tolerance and understanding endeavor to bring the deliberations of the whole jury to an agreement upon a verdict. Do not

---

**6.** Two lawyers represented Defendant at trial, and the prosecutor and an assistant prosecutor represented the State. For purposes of convenience, we will use the terms "defense counsel" and "the prosecutor" without identifying a specific lawyer.

**7.** The trial transcript does not include the proceedings that occurred at about this time, but the parties were granted leave to file a supplemental legal file that consisted of a stipulation between the prosecutor and de-

fense counsel concerning the proceedings relating to questions from the jury during its deliberations ("the stipulation"). *See* Rule 81.12(f). The stipulation also provided that "[t]he official court reporter has reviewed her notes and tapes and has been unable to produce this portion of the deliberations." The questions from the jury and the trial court's written responses, including the written hammer instruction, were included in the legal file.

be afraid to change your opinion if the discussion persuades you that you should. But a juror should not agree to a verdict that violates the instructions of the Court, nor should a juror agree to a verdict of guilty unless he is convinced of the defendant's guilt beyond a reasonable doubt.

The attorneys stipulated that defense counsel objected to the reading of the hammer instruction, and the prosecutor "has no independent recollection of [defense counsel's objection] but has no reason to dispute that [defense counsel] objected to" it. The stipulation does not include the legal basis for defense counsel's objection.

Sometime between 4:45 and 6:30 p.m., three additional questions were received from the jury: (1) "What is the definition of murder in the second degree?"; (2) "Can we agree to a lesser charge?"; and (3) "Could we please see the doctor's CVs?"[8] The trial court replied "Yes" to question 3 and provided a combined response to questions 1 and 2: "The definition of murder in the second degree is contained in Instruction No. 7. You are to consider the Instructions only as provided."

At 6:06 p.m., the trial court informed the parties that the jury asked: " 'Can we please get a copy of the coroner's report or the cause of death stated on the death certificate?' "[9] Defense counsel had no objection to the trial court's response, " 'Neither were introduced into evidence as an exhibit. You will continue to be guided by the instructions of the Court in your deliberations.' "

The trial court reconvened at 6:30 p.m. with a question from the jury: " 'Was Dr. Case the coroner who decided the official cause of death of [Child]?' " Defense coun-

sel had no objection to the trial court's reply: "The Court can only direct you to rely on your recollection of the evidence and the instructions of the Court as you continue your deliberations.' " The transcript does not reveal the time that the jury returned its verdict, but the stipulation states that the verdict was returned at 9:30 p.m.

Defendant's second point is also unpreserved for review due to his failure to demonstrate that the post-trial motion was timely filed. When a challenge to the giving of the hammer instruction is properly preserved, the appellant "must show from the record that the jury's verdict was coerced." *Williams*, 409 S.W.3d at 467. "[I]nstructional error seldom constitutes plain error, which requires a defendant to show more than mere prejudice." *State v. Roe*, 6 S.W.3d 411, 415 (Mo. App. E.D. 1999).

"The hammer instruction itself is not coercive in that it seeks open discussion, tolerance, and the desirability of a unanimous verdict and admonishes the jurors against basing a verdict on evidence they do not believe is true." *State v. Hutson*, 487 S.W.3d 100, 112 (Mo. App. W.D. 2016). Here, when the jury asked about "the process if we cannot come to a conclusion[,]" the trial court did not respond by giving the hammer instruction. Instead, it directed the jury to "refer to the instructions given and proceed with deliberations[.]" The jury continued to deliberate, eventually sending out four additional questions. The trial court did not give the hammer instruction until the jury informed the trial court at 4:30 p.m. that it had "referred to the instructions given, and we cannot reach a consensus[,]" and the fore-

---

**8.** The transcript does not reflect the proceedings of the responses to these questions, and the stipulation does not indicate that defense counsel objected to them.

**9.** In the handwritten question, the word "please" was underlined three times.

person sent the question, "Where do we go from here?" Further, the jury did not return its verdict shortly after the instruction was given. Instead, it continued to deliberate, sending out five additional questions before finally returning a verdict at 9:30 p.m. Nothing in these circumstances suggests a coerced verdict. Point 2 is denied.

*Point 3—Error in the Written Judgment*

The State admits that "[t]he written judgment incorrectly reflected that [Defendant] was sentenced to 99 years for murder in the second degree[,]" and this clerical error must be corrected. *See Burns*, 478 S.W.3d at 527. We agree. Point 3 is granted.

### Conclusion

Finding no error, plain or otherwise, in the trial court's decisions to allow the State to call Dr. Atzemis as a witness and to give the "hammer" instruction when it did, we affirm Defendant's convictions and remand the cause for the trial court to enter a written judgment consistent with its oral pronouncement of sentence.

JEFFREY W. BATES, P.J.— CONCURS

GARY W. LYNCH, J.—CONCURS