

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| vs. | ) | WD78090 |
| | ) | |
| CALVIN HUTSON, | ) | Opinion filed:  April 19, 2016 |
| | ) | |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY, MISSOURI**
**THE HONORABLE DANIEL R. GREEN, JUDGE**

Before Division One:  Victor C. Howard, Presiding Judge,
Gary D. Witt, Judge and Zel Fischer, Special Judge

Calvin Hutson appeals his convictions and sentences following a jury trial for murder in the second degree (felony), section 565.021;[1] robbery in the first degree, section 569.020; armed criminal action, section 571.015; and unlawful possession of a firearm, section 571.070, RSMo Cum. Supp. 2013.  Hutson raises four points on appeal challenging the admission of certain testimony by witnesses; the sufficiency of the evidence to support the felony murder, robbery, and armed criminal action convictions; and the giving of the hammer instruction to the jury.  The judgment of convictions is affirmed.

---

[1] All statutory references are to RSMo 2000 unless otherwise indicated.

## Factual Background

Viewed in the light most favorable to the verdict, the evidence was as follows. On December 27, 2012, Justin Beasley and Alexzondrea Walker met with the appellant, Calvin Hutson, at an apartment in Jefferson City. Hutson made statements indicating that he wanted to rob someone of marijuana. Hutson asked Beasley to find him a gun. They drove to the home of a friend of Beasley's and borrowed a nine-millimeter handgun. Hutson then made a phone call to a man named Andre Hudson, the victim.

That same evening, David Evans and the victim drove to the victim's house in Holt's Summit. Evans wanted to borrow a shotgun from the victim because he had had trouble with his stepdaughter's boyfriend earlier in the day. The victim, the victim's wife, and Evans then left in a Chevy Suburban to drive back to Jefferson City. The victim's wife was driving. The three first stopped at a nearby gas station so the victim could buy liquor. The victim's cell phone was ringing nonstop. Hutson was calling the victim, and the victim's wife could tell from the conversations that the phone calls concerned a marijuana transaction. The victim told his wife that they were going to meet somebody to get some money.

In the meantime, Hutson and Beasley had gone to Zesto's Drive-In restaurant in Beasley's Dodge Stratus. The victim directed his wife to drive to Zesto's and to pull into an alley above and behind the restaurant. Hutson told Beasley to follow the Suburban into the alley.

The two vehicles stopped in the alley, and the victim got out of the Suburban and into the back passenger seat of the Stratus behind Hutson. The victim had a handgun with him. Beasley testified that he had the music turned up loud and could not hear what was being said between Hutson and the victim. He said he heard someone yell and then a gunshot. He got out of the car

2

and ran. He heard five or six more shots as he ran. Beasley testified that the victim fired the first shot.

As the victim's wife sat in the Suburban, she saw the Stratus start to shake. She and Evans then heard multiple gunshots and saw muzzle flashes inside the car. Bullets shattered the back window of the Suburban. The victim's wife saw the driver running, and she pulled the Suburban around to try to follow him as she called 911. She and Evans then saw Hutson walking down some steps. He was bloody and appeared dizzy but took off running when the victim's wife said to Evans, "That's him." The victim's wife then drove after Hutson. She hit Hutson with the SUV when he ran out in front of her as she drove down the alley. Hutson got up and ran away, but he only made it about a block before the police stopped him.

Meanwhile, Beasley returned to the Stratus and found the victim in the back seat. He believed the victim was dead. Beasley got into the car and drove off but only got a short distance before police started following him. He stopped the car, got out, and ran back to his house where he changed clothes and fled. He eventually turned himself in. The officer who had been pursuing the Stratus found the victim's body in the back passenger seat. The victim's pockets contained $61 in cash, a bag of marijuana, and his phone.

At the scene, Hutson told the police that he was in a gray car with a man named Terion McDaniels when another vehicle pulled up and its occupants shot him. Hutson was taken to the hospital with three gunshot wounds to his left arm, side, and hip. At the hospital, Hutson gave police a different account of how he was shot. He said that he had gone to the area to meet a man named Jay who wanted to buy some DVDs or CDs from him. After Jay got into the back seat of the car and while they were talking, shots suddenly rang out inside the vehicle. Hutson

3

said he was hit and got out and ran until he collapsed where police found him. Hutson denied having any weapons at the meeting.

Police found a blood trail running from the scene of the shooting to the location where Hutson was found. An officer who followed the trail found a bloody piece of carpet alongside a shed. He discovered a Hi-Point nine-millimeter pistol and two large bags of marijuana under the carpet. The slide of the handgun was in the lock-back position, which commonly means that all of the bullets have been fired from the magazine. Hutson's DNA was found on the opening of the gun's barrel and on the grip.

Police found a Kel-Tec nine-millimeter pistol in the Stratus under the victim's body. The victim's DNA was found on the grip of that handgun. The magazine contained two rounds, and a third round was ejected from the chamber. A total of eight nine-millimeter shell casings and a bullet were found in the back of the car, including one shell casing that was under the victim's body. Forensic tests showed that four of the shell casings had been fired from the High Point and three had been fired from the Kel-Tec. The eighth cartridge could not be matched to a particular handgun, but it had class characteristics consistent with being fired from a Hi-Point and inconsistent with being fired from a Kel-Tec.

Analysis of the recovered cell phones that belonged to Hutson and the victim showed that Hutson made several calls to the victim on December 27 beginning at shortly before 3:00 pm and ending shortly after 7:00 pm. The victim called Hutson about six minutes after the last phone call from Hutson.

An autopsy showed that the victim had been shot four times. He suffered wounds to both arms, a shoulder, and the head. The fatal wound entered the left eye damaging the brain.

4

Hutson did not testify. He presented the testimony of a man who lived near the scene of the shooting and recovered the shotgun that Evans had left near a shed. Hutson's defense at trial was that he shot the victim in self-defense after the victim shot him first. He requested a self-defense instruction, and one was given.

The jury found Hutson guilty on all counts. The trial court sentenced him to consecutive sentences of life imprisonment for felony murder, fifteen years for robbery, fifteen years for armed criminal action, and a concurrent sentence of seven years for unlawful possession of a firearm. This appeal by Hutson followed.

### Admission of Testimony

In the first two points addressed in this appeal, Hutson challenges the trial court's admission of certain testimony of Walker and Beasley. Walker testified that when Beasley said he "didn't feel right," he meant "he didn't feel right about going with [Hutson] to rob somebody." Beasley testified that when Hutson used the term "a lick," he meant a robbery. Hutson argues that Walker's and Beasley's opinions about what other people meant when they made these statements were speculation without any probative value and were highly prejudicial.

Walker initially testified without objection that Hutson asked her boyfriend Beasley if he knew of "any licks we can hit." She then testified without objection that "people my age know a lick means a quick come on, robbery, something quick coming or something." The prosecutor asked Walker if she had given Beasley any advice following his conversation with Hutson:

> A. No. It wasn't—not after the conversation. It was me and Justin were by ourselves. He was taking me to work. He said, I do not feel right about it. And I said, if you don't feel right, don't do it. The defendant wasn't there.
>
> Q: Do you know what [Beasley] was talking about when he said something didn't feel right?

5

Defense counsel objected that the question called for speculation as to what Beasley was talking about. The trial court overruled the objection, and Walker testified:

> A: He was basically talking about going to rob. He didn't feel right about going with [Hutson] to rob somebody, to hit a lick, he didn't feel right about it.

Beasley was the next witness to testify for the State. He testified without objection that Hutson wanted to talk to him about doing a "lick":

> Q: And what's the word "lick" mean?
>
> A: It can mean a lot of things.
>
> Q: What did it mean when you were talking about it with him?
>
> A: A robbery.
>
> Q: And so what did you do after—did he make any request of you, he being the defendant, Calvin Hutson—
>
> A: Yes.
>
> Q: —ask you for anything?
>
> A: Yes.
>
> Q: What was that?
>
> A: A gun.

Defense counsel next elicited from Beasley during cross-examination that Hutson never said the word robbery, only the term "lick." Defense counsel later returned to the subject in his cross-examination:

> Q: I want to talk to you about "hit a lick." [Hutson] said hit a lick. Right?
>
> A: Yeah.
>
> Q: You've said hit a lick before, haven't you?
>
> A: Yes.

Q: And lick can mean things other than robbery, can't it?

A: Yes.

Q: It means to get cash fast, doesn't it?

A: Yeah.

Q: It can mean buy some weed and turn around and sell it at a profit, couldn't it?

A: Yes.

Q: It could mean selling fake weed and making a profit, couldn't it?

A: Yes.

Q: In fact, you recently won playing some dice, didn't you?

A: Yes.

Q: And you put your hands in the air?

A: Yeah.

Q: And you said, I hit a lick?

A: Yep.

Q: And you weren't talking about a robbery?

A: No.

Q: You were talking about winning a dice game.

A: Yes.

Q: And [Hutson] told you, I'm going to hit a lick?

A: Yes

Q: He didn't say robbery?

A: No.

The prosecutor then questioned Beasley on redirect:

7

Q: Mr. Beasley, when [Hutson] was using the term "lick" to you that afternoon on December 27th, what was he using it to mean at that time?

At this point, Defense counsel objected for the first time about testimony concerning the term "a lick," and the trial court overruled the objection. The prosecutor continued:

Q: And what was he using it to mean when he was talking to you that afternoon?

A: A robbery.

Hutson's motion for new trial claimed that the trial court erred in overruling his objection to Beasley's testimony about what Hutson meant when he said he was going to hit a lick. The motion, however, did not raise a claim of error regarding Walker's testimony about what Beasley meant when he said he didn't feel right; therefore, that claim was not properly preserved for appeal. *State v. Tripp*, 168 S.W.2d 667, 679 (Mo. App. W.D. 2005). Issues not preserved may be reviewed for plain error only, which requires the reviewing court to find that manifest injustice or a miscarriage of justice has resulted from the trial court error. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009).

A trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion. *State v. Winfrey*, 337 S.W.3d 1, 5 (Mo. banc 2011). "The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Id.* (internal quotes and citation omitted). The appellate court reviews for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *Id.* "Trial court error is prejudicial if there is a reasonable probability that the court's error affected the outcome of the trial." *Id.* (internal quotes and citation omitted).

The trial court has broad discretion to admit a lay witness's testimony. *State v. Davidson*, 242 S.W.3d 409, 413 (Mo. App. E.D. 2007). Generally, a lay witness must state facts from

8

which the jury forms an opinion and may not testify regarding his or her opinion on a matter in dispute. *State v. Starkey*, 380 S.W.3d 636, 647 (Mo. App. E.D. 2012); *Davidson*, 242 S.W.3d at 413. An exception to the general rule allows a lay witness to provide an opinion if the witness possesses knowledge that is not available to the jury and that would be helpful to the jury to determine a disputed issue. *Id.*; *State v. Bivines*, 231 S.W.3d 889, 893 (Mo. App. W.D. 2007). Additionally, "a witness who personally observed events may testify to his matter of fact comprehension of what he has seen in a descriptive manner which is actually a conclusion, opinion or inference, if the inference is common and accords with the ordinary experiences of everyday life." *Davidson*, 242 S.W.3d at 414 (internal quotes and citation omitted). Such practice is justified by convenience as a "short-hand rendition of a composite situation" and by necessity to avoid losing evidence where it would be extremely difficult or impossible for the witness to convey an accurate sense of his or her observations if limited to a statement of facts in the traditional sense. *Id.* Thus, in *Davidson*, the witness was permitted to testify to her opinion about the meaning of statements made by the defendant in a series of letters that he addressed to her. *Id.* at 413-414. In *State v. Langford*, 455 S.W.3d 73, 76-77 (Mo. App. S.D. 2014), a store clerk was permitted to testify about her impression that the defendant was attempting to pay for items with a fake fifty-dollar bill that he laid on the counter. And in *Starkey*, a prosecutor was allowed to testify as a crime victim that he believed the defendant's threats against him were credible. 380 S.W.3d at 647-48.

In this case, Walker's testimony about what Beasley meant when he said he didn't feel right was her matter of fact comprehension of the entire transaction. Walker first witnessed Hutson ask Beasley about "hitting a lick" and finding a gun and then she had the private conversation with Beasley. As in *Davidson*, Walker's testimony was a "short-hand rendition of a

9

composite situation." She had personal knowledge of the matter having observed the conversation between Hutson and Beasley, and her opinion about what Beasley meant was helpful to the jury. The trial court did not plainly err in allowing her testimony.

Similarly, Beasley's testimony about what Hutson meant by the term "lick" was also admissible. Beasley had special knowledge regarding his conversation with Hutson, and he further had a familiarity with the slang term as evidenced by his testimony regarding other meanings the word can have. His testimony assisted the jury in determining the meaning of the slang word unfamiliar to the average juror and the context of his conversation with Hutson.

Even if the admission of Beasley's testimony were improper, Hutson would not be entitled to relief. A defendant is not prejudiced when allegedly improper evidence was merely cumulative to other evidence admitted without objection establishing the same facts. *State v. Davies*, 330 S.W.3d 775, 797 (Mo. App. W.D. 2010). Prior to Beasley's testimony, Walker testified without objection that she heard Hutson asked Beasley if he knew of "any licks we can hit" and that a "lick" means a robbery. Furthermore, Beasley testified on direct examination without objection that Hutson wanted to talk to him about doing a "lick" and that a "lick" meant a robbery in that conversation. Beasley's testimony that Hutson objected to on redirect was, therefore, merely cumulative to testimony on the same matter already admitted without objection. The points are denied.

### Sufficiency of the Evidence

In the next point addressed in this appeal, Hutson contends that the trial court erred in denying his motion for judgment of acquittal and entering judgment of conviction and sentence for first-degree robbery. He argues that the evidence was insufficient to establish beyond a reasonable doubt that he tried to forcibly steal marijuana from the victim with the use or threat of

a firearm. He further argues that because the first-degree robbery charge formed the basis for both the felony murder and armed criminal action charges, those convictions were also not supported by sufficient evidence for the same reason.

Review of a challenge to the sufficiency of the evidence to support a criminal conviction is limited to determining whether sufficient evidence was presented from which a reasonable juror could find the defendant guilty beyond a reasonable doubt. *State v. Nash*, 339 S.W.3d 500, 508-09 (Mo. banc 2011). It is not an assessment of whether the reviewing court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rationale fact-finder could have found the essential elements of the crime beyond a reasonable doubt. *Id.* The evidence and all reasonable inferences drawn from the evidence are viewed in the light most favorable to the jury's verdict, and any contrary evidence and inferences are disregarded. *Id.* at 509. The reviewing court does not act as a "super juror" with veto powers but gives great deference to the trier of fact. *Id.* It will not weigh the evidence anew since the fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances, and other testimony in the case. *Id.* The reviewing court reviews a sufficiency of the evidence claim not based on how the jury was instructed but upon how the crime was charged. *State v. Zetina-Torres*, No. SC95194, slip op. at 6 (Mo. banc March 1, 2016).

Count II of the substitute information charged that Hutson committed attempted robbery in the first degree:

> [I]n that on or about December 27, 2012, in the County of Cole, State of Missouri, the defendant, acting with another, set up a purported drug transaction with the victim, and threatened him with a firearm and demanded money and drugs, and such conduct was a substantial step toward the commission of the crime of Robbery in the First Degree, and was done for the purpose of committing such robbery.

11

For purposes of this case, a person commits the crime of first-degree robbery "when he forcibly steals property and in the course thereof he, or another participant in the crime, … [u]ses or threatens the immediate use of a dangerous instrument against any person; or … "[d]isplays or threatens the use of what appears to be a deadly weapon or dangerous instrument."  § 560.020.1.

> A person "forcibly steals", and thereby commits robbery, when, in the course of stealing, … he uses or threatens the immediate use of physical force upon another person for the purpose of:
>
> (a) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or
>
> (b) Compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the theft."

§ 569.010(1).  To be guilty of an attempt, the person must, with the purpose of committing the offense, do any act that is a substantial step toward the commission of the offense.  *State v. Ess*, 453 S.W.3d 196, 208 (Mo. banc 2015)(citing § 564.011).  "A 'substantial step' is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense."  § 564.011.

Hutson argues that the State presented no evidence that he displayed, used, or threatened the use of a gun in an attempt to forcibly steal money or drugs from the victim.  Specifically, he argues that no evidence was presented that he displayed any weapon prior to being shot by the victim, that he made any physical or verbal conduct indicating a threat to use a weapon, or that he was attempting to forcibly steal any property from the victim.

The phrases "in the course thereof" and "in the course of" in sections 560.020 and 560.010(1) require consideration of the entire course of the robbery in determining whether the elements of robbery have been satisfied. *State v. Summers*, 456 S.W.3d 441, 444-45 (Mo. App.

12

W.D. 2014). Thus, not only are the circumstances immediately surrounding the alleged robbery considered but also events prior to the robbery. *Id.* at 445. If the use of a weapon is a part of the whole, single transaction, the offense is robbery. *Id.* at 445. It is the use of a weapon "in the course of" forcible stealing that makes the offense first-degree robbery. *Id.*

In this case, consideration of events prior to and in the entire course of the attempted robbery indicates that Hutson used a weapon to try to take the victim's marijuana. He planned a robbery and asked Beasley to find a gun he could use, he contacted the victim and set up the purported drug deal at which the robbery would take place, he went to that meeting armed with a handgun, and he shot the victim four times in the car. Bags of marijuana were found alongside his handgun, which he had discarded as he tried to flee the scene.

In making his argument under this point, Hutson relies on *State v. Presberry*, 128 S.W.3d 80 (Mo. App. E.D. 2003). In that case, the Eastern District overturned the defendant's conviction of attempted first-degree robbery. *Id.* at 95. Evidence presented in the case showed that police officers were conducting surveillance of an ATM where customers had recently been accosted by a man; some reported that the man had displayed a gun. *Id.* at 93. The officers saw a man on a cell phone start to approach a car at the ATM and then run away; the defendant was sitting in a vehicle nearby with binoculars and a cell phone. *Id.* The police stopped the man who ran from the ATM and found a pellet gun in the sleeve of his coat. *Id.* The defendant and the other man had been communicating by cell phone. *Id.*

In reversing the conviction, the Eastern District relied on this court's decision in *State v. Ballenger*, 72 S.W.3d 154, 157 (Mo. App. W.D. 2002). *Presberry*, 128 S.W.3d at 93. That case held that a substantial step toward the commission of the underlying crime may be less than the last act needed to commit the underlying crime but must be something more than mere

13

preparation to commit the crime. *Id.* at 92. The Eastern District found that reasonable jurors could not have determined beyond a reasonable doubt that the defendant committed a substantial step toward first-degree robbery. *Id.* at 93. The court reasoned that, at most, the arguably suspicious conduct of the defendant and the other man may have constituted acts in preparation of robbery. *Id.* This court, however, has since overruled *Ballenger* and disagreed with *Presberry*. *State v. Young*, 139 S.W.3d 194, 198 (Mo. App. W.D. 2004). In *Young*, we explained that under the attempt statute, section 564.011, a substantial step toward the commission of an offense does not require an overt act or an act beyond mere preparation. *Id.*

The evidence in this case showed not only preparation by Hutson to commit robbery but overt acts towards the commission of the offense. Hutson planned to rob the victim of marijuana and acquired a handgun to use in committing the offense. He then arranged the meeting with the victim, took the handgun to the meeting, and shot the victim four times. Such evidence showed that Hutson had the purpose to commit the underlying offense of robbery and then took a substantial step toward committing the offense.

Hutson's argument also fails because he relies on evidence and inferences contrary to the verdict. He argues that his statement that he wanted to "hit a lick" could have meant a lot of different things. But the evidence showed that one recognized meaning of the phrase is to commit a robbery, and the jury was entitled to believe that Hutson's use of that phrase conveyed such intent. Hutson also argues that evidence was presented that it is common to bring a gun to a drug deal. Again, the jury was entitled to draw the contrary inference that Hutson brought the handgun to commit a robbery. Finally, Hutson relies on Beasley's testimony that the victim was the first to fire his gun in arguing that there was no evidence that he displayed a weapon before being shot. The jury may believe all, some, or none of the testimony of a witness. *Nash*, 339

14

S.W.3d at 509. The jury was not required to believe Beasley's testimony that the victim fired the first shot.

Sufficient evidence was presented for the jury to reasonably infer that Hutson used a firearm in the course of an attempt to rob the victim. Hutson raises no independent grounds on which his convictions for felony murder and armed criminal action should be reversed. The trial court did not err in denying Hutson's motion for acquittal or in entering judgments of conviction for first-degree robbery, felony murder, and armed criminal action. The point is denied.

### Hammer Instruction

In the final point in this appeal, Hutson contends that the trial court erred in giving the hammer instruction to the jury ten hours into its deliberation. He asserts that the court coerced a verdict with the instruction.

The jury began its deliberations at 10:15 a.m. At 7:10 p.m., the foreman sent a note indicating that one of the jurors would like to speak privately with the judge and asking whether it was possible. By agreement of the parties, the court sent back a written answer stating, "No."

The foreman sent a note at 7:58 p.m. that read:

> We are stuck in trying to come to a unanimous decision. One juror believes she needs to think the situation through. Are we here until the decision is made tonight? Will we go home at some point tonight and reconvene tomorrow morning? Requesting guidance.

The trial court took up the note at 8:38 p.m. The prosecutor requested that the trial court read the hammer instruction to the jury, and defense counsel objected. The trial court overruled the objection and brought the jury in at 8:45 p.m. stating:

> Good evening, ladies and gentlemen. You will recall one of the instructions I read to you, it indicated that the trials are governed by rule and those rules are binding on the attorneys, they are binding on me, and they are binding on you. So I want you to know that everything that we do here is we're all working under a plate, if you would. What I'm going to do is I'm going to read

15

you an instruction. After I read you that instruction, you are to follow the Marshal's instructions.

This will be Instruction No. 18 in our ensemble. You should make every reasonable effort to reach a verdict, as it is desired that there be a verdict in every case. Each of you should respect the opinions of your fellow jurors as you would have them respect yours, and in a spirit of tolerance and understanding endeavor to bring the deliberations of the whole jury to an agreement upon a verdict. Do not be afraid to change your opinion if the discussion persuades you that you should. But a juror should not agree to a verdict that violates the instructions of the Court, nor should a juror agree to a verdict of guilty unless he is convinced of the defendant's guilt beyond a reasonable doubt.

The Marshal is going to take you back to your jury room.

The jury returned to open court at 9:00 p.m. and announced its verdict. At the defense's request, the jury was polled, and all jurors expressed their agreement with the verdict.

The length of time that a jury is allowed to deliberate and the decision whether to give the hammer instruction are matters within the trial court's discretion. *State v. Williams*, 409 S.W.3d 460, 466 (Mo. App. W.D. 2013). "To demonstrate an abuse of discretion, the appellant must show from the record that the jury's verdict was coerced." *Id.* at 467.

The hammer instruction itself is not coercive in that it seeks open discussion, tolerance, and the desirability of a unanimous verdict and admonishes the jurors against basing a verdict on evidence they do not believe is true. *State v. Johnson*, 948 S.W.2d 161, 164 (Mo. App. E.D. 1997). "The verdict is only considered coerced when under the totality of the circumstances it appears that the trial court was virtually directing that a verdict be reached and by implication indicated that it would hold the jury until a verdict was reached." *Id.* (internal quotes and citation omitted). A reviewing court considers several factors in determining whether a hammer instruction coerced the jury's verdict. *Williams*, 409 S.W.3d at 467. They include: (1) the amount of time the jury deliberates before the instruction is given; (2) the amount of time that elapses between the reading of the instruction and the verdict; (3) whether the trial court knows

16

numerically how the jury is split and the position of the majority; and (4) whether the giving of the instruction conforms with the Notes on Use. *Id.*

Hutson argues that by not answering the jury's question about if and when it would go home and instead reading the hammer instruction, the trial court led the jury to believe it would not be released until it came to a unanimous verdict and, thereby, coerced the verdict. In making this argument, he relies on *State v. McNail*, 767 S.W.2d 84 (Mo. App. E.D. 1989). In *McNail*, the defendant was charged with two counts of rape of his minor daughter. *Id*. at 84. The jury began deliberations at 1:05 p.m. on a Saturday that was the start of a three-day holiday period. *Id.* at 86. The jury sent a note at approximately 5:30 p.m. indicating a ten to two split in favor of guilt. *Id.* The court responded over the defendant's objection that the jury should continue deliberating. *Id.* The jury sent a second note at 7:45 p.m. stating that the two holdout jurors would not compromise their positions and asking how long the jury must deliberate before being declared a hung jury. *Id.* The court again advised the jury over the defendant's objection to continue deliberating. *Id.* At 8:07 p.m., the trial court read the hammer instruction over the defendant's objection. *Id.* Shortly after 9:00 p.m., the court instructed a deputy sheriff to obtain from the jurors contact numbers of relatives or friends who could bring a change of clothes and toiletries for an overnight stay at a hotel. *Id.* The jury returned a verdict ten minutes later acquitting the defendant of one count, convicting on the other, and imposing the minimum punishment of five years imprisonment. *Id.*

The Eastern District found coercion under the totality of the circumstances. *Id.* It reasoned, "It is difficult to conceive that under these circumstances the verdict was other than a compromise reached because the trial court had virtually directed that a verdict be reached and by implication indicated it would hold the jury until a verdict was reached." *Id.* at 87.

17

Unlike in *McNail*, the record in this case fails to indicate coercion. The jury deliberated for ten hours and thirty minutes before the court gave the hammer instruction and another fifteen minutes after the instruction before reaching a verdict. Several cases have found that shorter deliberation times did not indicate coercion. *See, e.g., State v. Scott*, 348 S.W.3d 788, 798-99 (Mo. App. S.D. 2011)(deliberation for four hours and fifty minutes before instruction and thirty-nine minutes after), *abrogated on other grounds by State v. Sisco*, 458 S.W.3d 304 (Mo. banc 2015); *State v. Carriker*, 342 S.W.3d 425, 427 (Mo. App. E.D. 2011)(deliberation for three hours before instruction and ten minutes after); *State v. Dodd*, 10 S.W.3d 546, 553 (Mo. App. W.D. 1999)(deliberation for two hours and forty-seven minutes before instruction and thirty minutes after); *State v. Jackson*, 896 S.W.2d 77, 80 (Mo. App. W.D. 1995)(deliberation for two hours and thirty minutes before instruction and thirty-three minutes after); *State v. Kinder*, 858 S.W.2d 838, 839 (Mo. App. S.D. 1993)(deliberation for two hours and nineteen minutes before instruction and ten minutes after).

Likewise, although the trial court was informed that the jury was having trouble arriving at a unanimous verdict and that one juror believed she needed more time to think about the case, that information did not necessarily reflect an eleven to one split in the jury or indicate the position of the majority or any one juror.

Finally, the trial court complied with the Notes on Use in giving of the hammer instruction. It allowed counsel for both sides to make objections before giving the instruction; it numbered, read, and submitted the instruction to the jury; and the court noted on the record the time that the jury first retired to deliberate, the time it gave the hammer instruction, and the time the jury returned a verdict.

The trial court did not make any other statements to the jury other than reminding it of its previous instruction that all participants in the jury trial, including the jury, must follow the established rules. The trial court did not tell the jury that it must reach a verdict in the case and did not imply that it would hold the jury until a verdict was reached. The hammer instruction was clear that a juror was to only agree to a guilty verdict if she was convinced of the defendant's guilt beyond a reasonable doubt. The use of the hammer instruction did not coerce the jury's verdict, and the trial court did not abuse its discretion in giving it. The point is denied.

The judgment of convictions is affirmed.

_____
VICTOR C. HOWARD, JUDGE

All concur.