STATE of Missouri, Respondent,

v.

Robert A. SNIDER, Appellant.

No. ED 104507

Missouri Court of Appeals,
Eastern District,
DIVISION ONE.

FILED: December 12, 2017

Maleaner Harvey, 1010 Market St., Suite 1100, St. Louis, MO 63101, for appellant.

Joshua Hawley, Karen L. Kramer, P.O. Box 899, Jefferson City, MO 65102, for respondent.

KURT S. ODENWALD, Judge

### Introduction

Robert A. Snider ("Snider") appeals from the judgment of the trial court, entered after a jury trial, convicting him on one count of first-degree robbery and one count of armed criminal action. Snider presents two points on appeal. Snider first posits that the trial court erroneously denied his motion to suppress evidence of Victim's pre-trial identification of him as the suspect, arguing that the pre-trial identification was the result of impermissibly suggestive police procedures. Snider next challenges the trial court's use of MAI-CR 3d 312.10,[1] "the hammer instruction," claiming that it effectively coerced and directed the jury to find him guilty. We deny Snider's first point because the police did not use impermissibly suggestive procedures to obtain Victim's pre-trial identification of Snider. We deny Snider's second point because the trial court's use of the hammer instruction was within its sound discretion. Accordingly, we affirm the judgment of the trial court.

### Factual and Procedural History

The State charged Snider with one count of first-degree robbery and one count of armed criminal action. The follow-

---

1. All references to the MAI and its Notes on Use are to versions found in Missouri Approved Instructions—Criminal (3rd ed., as revised 9-1-90).

ing evidence, viewed in the light most favorable to verdict, was presented at trial. On the night of September 14, 2014, Victim, an employee of a St. Louis casino, was released early from her scheduled shift. Victim used the elevator to reach the fourth floor of the casino's well-lit parking garage. As she exited the elevator lobby, Victim noticed a man, who was standing alone near her. The man was peering over his shoulder and watching Victim. Victim started to walk past the man, but she felt the man reach out and grab her bag. The man pulled on Victim's bag, but Victim resisted. Turning to face each other, Victim and the man struggled over the bag for three to five seconds. Victim shouted loudly while staring directly at the man's face. When Victim raised her fist, the man pressed a gun to Victim's abdomen, instructing her repeatedly, "Don't do it." Observing and feeling the gun shoved against her body, Victim relinquished the bag, and the man fled. According to Victim, the man had pronounced cheeks and forehead, a wider-set nose, dark-brown eyes, a dark complexion, and thick dreadlocks.

Police officers responded to the scene. The officers received a description of the suspect from Victim, reporting the suspect as an African-American male, 5'6' to 5'8' tall, having a dark complexion, wearing thick dreadlocks, and weighing around 220 lbs. Victim's description of the man matched the casino's surveillance videos. After reviewing the surveillance videos, the officers ascertained that the suspect entered a car in the parking garage, which was driven by a second person of interest. Two weeks later, the officers were able to locate the vehicle used to flee the scene and detain the driver, who matched the description of the second person of inter-

est. Thereafter, officers received information that Snider was a suspect in the robbery.

After learning of Snider's potential involvement with the case, Detective John Anderson ("Det. Anderson") examined Snider's photograph, recognizing that Snider matched the description of the suspect given by Victim. Det. Anderson placed Snider's photograph in a photographic line-up, compiled from the State's crime-matrix system. The crime-matrix system created a six-person photographic array—including one photograph of Snider and five filler photographs—based on people of similar ages, sizes, and hairstyles. The six photographs were each on a separate page and the photographs were shown sequentially in an order randomly selected by the crime-matrix system.

Det. Anderson contacted Victim on September 28, 2014, and asked her to view the lineup. Det. Anderson and Detective Lyla Payne ("Det. Payne") met with Victim. Det. Payne was not involved with the investigation and was the blind administrator of the line-up. At the meeting, Det. Anderson informed Victim that Det. Payne would show her some pictures, but that the photographs may or may not contain the suspect. Det. Anderson then stepped away, and Det. Payne sequentially displayed the photographs to Victim. Victim immediately selected Snider's photograph when shown. Victim explained that Snider was the man who robbed her and that she was certain of the identification. The detectives advised Victim that she needed to be certain. Victim reviewed the photographs and again selected Snider's picture. On an acknowledgement form, Victim wrote her name, the date of the identification, and the time of the identification.[2] Victim testified that

___

2. The detectives used an acknowledgment form designed for a physical show-up and not

for a photographic line-up. Det. Anderson explained that the detectives accidently used the

she would not have made an identification if the suspect had not been present in the lineup.

Snider moved to suppress Victim's pre-trial identification and any related testimony. Snider emphasized that Victim's pre-trial identification was made contrary to established police procedures because the detectives did not: (1) advise Victim that the suspect may or may not be in the lineup; (2) inform Victim that the investigation would continue regardless of her ability to identify the suspect; and (3) instruct Victim before showing the photographs that she must be certain in her identification. The trial court denied both Snider's motion to suppress and his continued objections at trial, admitting the photographic line-up into evidence as well as any related testimony. The trial court found that the police procedures used were not impermissibly suggestive and that Victim had a sufficient independent basis for making the pre-trial identification.

The case was submitted to the jury. The jury began deliberating at 10:28 a.m. Around 2:30 p.m., the trial court received a note from the jury. The note, in pertinent part, stated: "The jury is 10 guilty and 2 not guilty. Reasonable doubt has been expressed whether the photo lineup was handled properly and whether proper procedures were followed, and also of [Victim's] accuracy of identification. Where do we go from here?" After receiving the note, Snider moved for a mistrial, which was denied. The trial court then recalled the jury

to the courtroom to read Instruction No. 13, the hammer instruction, which was patterned after MAI-CR 3d 312.10.[3] After the trial court read the instruction around 2:55 p.m., the jury resumed its deliberations. Snider renewed his request for a mistrial, specifically referencing the jury's note. The trial court again denied the request. At 4:08 p.m., the jury ended its deliberations, finding Snider guilty of both first-degree robbery and armed criminal action. Snider unsuccessfully moved for a new trial, arguing, *inter alia*, that the trial court erred in admitting Victim's identifications into evidence and by reading the hammer instruction to the jury. Finding Snider a prior and persistent offender, the trial court sentenced him to twenty-five years in prison on each of the counts, to run concurrently. This appeal follows.

## Points on Appeal

Snider raises two points on appeal. In Point One, Snider asserts that the trial court erroneously denied his motion to suppress Victim's pre-trial identification because the pre-trial identification was the result of impermissibly suggestive police procedures, thereby violating his constitutional rights to due process and to a fair and impartial trial. In Point Two, Snider argues that the trial court erred in reading the hammer instruction because the instruction effectively coerced and directed the jury return a guilty verdict.

wrong form, but that the two forms shared largely the same information.

**3.** The full text of Instruction No. 13 was as follows:

You should make every reasonable effort to reach a verdict, as it is desirable that there be a verdict in every case. Each of you should respect the opinions of your fellow jurors as you would have them respect yours, and in a spirit of tolerance and understanding endeavor to bring the deliberations of the whole jury to an agreement upon a verdict. Do not be afraid to change your opinion if the discussion persuades you that you should. But a juror should not agree to a verdict that violates the instructions of the Court, nor should a juror agree to a verdict of guilty unless he is convinced of the defendant's guilt beyond a reasonable doubt.

## Discussion

### I. Point One—Victim's Identification of Snider

#### A. Standard of Review

▮ "Appellate courts will reverse a ruling on a motion to suppress only if it is clearly erroneous and will reverse admission of testimony only if the trial court abused its discretion." State v. White, 518 S.W.3d 288, 291 (Mo. App. E.D. 2017), "We review the whole record, consider the totality of the circumstances, and affirm if the trial court's ruling is supported by substantial evidence." State v. McVay, 518 S.W.3d 217, 223 (Mo. App. S.D. 2016). "If the ruling is plausible, in light of the record viewed in its entirety, we will not reverse even if we would have weighed the evidence differently." State v. Ivy, 455 S.W.3d 13, 17 (Mo. App. E.D. 2014). On appeal, "[w]e defer to the credibility findings of the trial court and view the facts in a light most favorable to the judgment[,]" ignoring inferences to the contrary. State v. Russell, 462 S.W.3d 878, 882 (Mo. App. E.D. 2015). However, the ultimate issue of whether any constitutional provision was violated is a question of law that this court reviews de novo. State v. Davis, 522 S.W.3d 360, 364 (Mo. App. E.D. 2017).

#### B. No Trial-Court Error in Denying Motion to Suppress

▮ Point One challenges the trial court's denial of the motion to suppress Victim's pre-trial identification of Snider as the robbery suspect. Trial courts employ a two-step process in determining whether to exclude a witness's pre-trial identification of a defendant. White, 518 S.W.3d at 291. The first step requires the trial court to determine whether the pre-trial identification was the result of impermissibly suggestive police procedure. Id. at 291–92. The second step involves the trial court determining the impact of the impermissibly suggestive police procedure on the reliability of the witness's identification. State v. Kayser, 397 S.W.3d 37, 40 (Mo. App. E.D. 2013), "A pre-trial identification procedure is unduly suggestive if the identification results not from the witness's recollection of first-hand observations, but rather from the procedures or actions employed by the police." State v. Murray, 428 S.W.3d 705, 710 (Mo. App. E.D. 2014) (quoting State v. Chambers, 234 S.W.3d 501, 513 (Mo. App. E.D. 2007)); see also State v. Watkins, 527 S.W.3d 204, 209 (Mo. App. E.D. 2017) (explaining that "[p]olice procedures are impermissibly suggestive when a witness's identification of the defendant is made in response to the suggestions or encouragement of police"), "[T]he identification will only be inadmissible if the identification procedures were so suggestive that they created a 'very substantial likelihood of irreparable misidentification.'" Russell, 462 S.W.3d at 883 (quoting State v. Floyd, 347 S.W.3d 115, 125 (Mo. App. E.D. 2011)): If the defendant is unable to show that the police procedure was impermissibly suggestive under the first prong of the two-step test, we will not reach the second prong. Kayser, 397 S.W.3d at 40.

Snider contends that the procedures used here were impermissibly suggestive, as evidenced by the detectives' disregard of internal police policies on administering photographic line-ups. Specifically, Snider points to the detectives' purported failure to inform Victim that the suspect might not be in the lineup, the lack of an explicit instruction to Victim that she needed to be certain in her identification, and the absence of a statement that the investigation would continue regardless of Victim's ability to identify the suspect.

▮ Snider has not demonstrated that the police procedures used in the

identification process were impermissibly suggestive. Regarding Snider's claim that the Victim was not informed of the suspect's possible absence from the line-up, Snider ignores our standard of review. Although Victim did not remember any instruction informing her that the suspect's photograph may or may not be contained in the line-up, Det. Anderson testified that he issued such a warning to Victim before Det. Payne conducted the photographic line-up. We view the evidence in the light most favorable to the trial court's ruling and ignore inferences to the contrary. Russell, 462 S.W.3d at 882. Thus, we credit Det. Anderson's testimony that he advised Victim of the possibility that the suspect was not present in the line-up.

█ Further, we reject Snider's arguments that, because the record is unclear whether Det. Payne explicitly informed Victim the investigation would continue even without a positive identification as well as the precise timing of the detectives' warning that Victim needed to be certain in making the identification, the police procedure used was necessarily coercive. Police officers and detectives should follow established internal procedures for photographic line-ups and other methods of pretrial identifications when such polices endeavor to produce accurate and reliable identifications. Yet, the question here is whether the police procedure used was so suggestive that it dictated Victim's identification of Snider, rather than permit an identification derived from her recollection. We do not find that the detectives' belated question to Victim that she must be absolutely certain, asked after she recognized Snider rather than before, was an indication of overly suggestive police practices. Similarly, the detectives' possible failure to inform Victim that the investigation would continue regardless of Victim's ability to identify Snider did not create a suggestive identification. Instead, the possibility that the detectives did not strictly follow their own internal procedures here went to the weight of the evidence, and the jury could have discounted the admitted identification evidence accordingly.

We are not persuaded that the procedures followed in this case were impermissibly suggestive. The record contains sufficient evidence supporting a finding that Victim's identification was the product of her first-hand recollection. Det. Anderson compiled the photographic line-up using six photographs—one containing Snider and five containing filler photographs—from a crime-matrix system designed to generate filler photographs based on the suspect's physical characteristics. Det. Anderson asked Victim to view the pictures with Det. Payne, the blind administrator of the photographic line-up. Det. Payne displayed the six photographs to Victim sequentially. Snider does not suggest that Det. Payne or Det. Anderson made any threats or promises to Victim in order to secure her identification of Snider. Nor does the record reflect that the detectives made any suggestive remarks indicating that the suspect was definitively included in the line-up or that the suspect was represented in any particular picture displayed. The record is void of any evidence that the detectives prompted Victim to identify Snider by singling out any of the individual photographs. Victim did not receive assistance from any other person when she identified Snider. Instead, Victim was instructed that the suspect may or may not be in the line-up and that she should inform the detectives if she viewed the person who robbed her. Victim thereafter identified Snider, recognizing him based on her recollection of his facial features, and Victim was definite and certain of the identification. The detectives warned Victim that she must be certain of the identification. Victim reviewed the photo-

graphs, again selecting Snider. Sufficiently warned, Victim remained confident in her identification throughout the pre-trial process. Additionally, Victim testified that if the detectives had shown her pictures that did not contain the suspect, she would have stated so during the photographic line-up. Victim maintained that she would not have selected a photograph had she been uncertain. Credible evidence supported the trial court's determination that Victim's identification was not the result of impermissibly suggestive police procedures. See White, 518 S.W.3d at 292; State v. Polk, 415 S.W.3d 692, 697 (Mo. App. E.D. 2013) (finding permissible a photographic line-up depicting six photographs generated by a computer system where the officer administering the lineup informed the witness that her attacker may or may not be pictured and that she was under no obligation to identify anyone).

The trial court did not err in its determination that the pre-trial identification was not the product of any impermissibly suggestive police procedures, but rather was the result of Victim's first-hand recollections. Because the police procedures were not unduly suggestive, we need not address the reliability of the witness's identification. See Kayser, 397 S.W.3d at 40. The trial court properly admitted Victim's pre-trial identification as well as her subsequent testimony. Point denied.

## II. Point Two—The Hammer Instruction

### A. Standard of Review

■ "A trial court may give the hammer instruction when it 'deems it appropriate and when the length of deliberation or communication from the jury causes the [trial c]ourt to believe that that the jury may be deadlocked.'" State v. Carl, 389 S.W.3d 276, 288 (Mo. App. W.D. 2013) (quoting State v. Fassero, 256

S.W.3d 109, 116 (Mo. banc 2008)). Accordingly, the trial court's decision to give the hammer instruction is a matter within its sound discretion. State v. Williams, 409 S.W.3d 460, 466 (Mo. App. W.D. 2013). "To demonstrate an abuse of discretion, the appellant must show from the record that the jury's verdict was coerced." State v. Hutson, 487 S.W.3d 100, 112 (Mo. App. W.D. 2016) (quoting Williams, 409 S.W.3d at 467). "A verdict is coerced when 'under the totality of the circumstances it appears that the trial court was virtually directing that a verdict be reached and by implication it would hold the jury until a verdict was reached.'" Carl, 389 S.W.3d at 288 (quoting State v. Bracken, 333 S.W.3d 48, 56 (Mo. App. E.D. 2010)).

### B. No Abuse of Discretion in Giving the Hammer Instruction

■ The trial court read MAI-CR 3d 312.10—the hammer instruction—to the jury. On appeal, Snider contends that the trial court essentially directed a verdict by reading the instruction after it received the unsolicited note from the jury suggesting the ten-to-two split in favor of returning a guilty verdict.

■ "The giving of a hammer instruction alone is not coercive under Missouri law." State v. Adkison, 517 S.W.3d 645, 649 (Mo. App. W.D. 2017). Indeed, "[t]he hammer instruction itself is not coercive in that it seeks open discussion, tolerance, and the desirability of a unanimous verdict and admonishes the jurors against basing a verdict on evidence they do not believe is true." Hutson, 487 S.W.3d at 112. Though not unduly influential itself, the coerciveness of the hammer instruction is considered under the totality of the circumstances then before the trial court. See State v. Campbell, 147 S.W.3d 195, 202 (Mo. App. S.D. 2004). We review several factors to determine whether the trial

court used the hammer instruction in a coercive manner, including:

(1) the amount of time the jury deliberates before the instruction is given; (2) the amount of time that elapses between the reading of the instruction and the verdict; (3) whether the trial court knows numerically how the jury is split and the position of the majority; and (4) whether the giving of the instruction conforms with the [Missouri Approved Jury Instructions] Notes on Use.

Adkison, 517 S.W.3d at 649 (quoting Hutson, 487 S.W.3d at 112). None of the above-listed factors are dispositive to the question of a coerced verdict. State v. Carriker, 342 S.W.3d 425, 427 (Mo. App. E.D. 2011).

As previously stated, the first factor requires consideration of the amount of time the jury deliberated before receiving the hammer instruction. Adkison, 517 S.W.3d at 649. A lengthy deliberation by the jury may indicate that a hammer instruction was necessary to encourage the jury's continued deliberation and was needed to guide the jury on how to respond to a potential deadlock. See id. at 649–50. Here, the jury spent over four hours deliberating on the robbery charge and the corresponding armed-criminal-action charge. Other appellate courts have found that the trial court was entitled to use the hammer instruction to secure continued deliberation even when the jury had spent less than four hours deliberating. See Carriker, 342 S.W.3d at 427 (deliberated for three hours before the hammer instruction); State v. Dodd, 10 S.W.3d 546, 553 (Mo. App. W.D. 1999) (deliberated for two hours and forty-seven minutes before the hammer instruction); State v. Jackson, 896 S.W.2d 77, 80 (Mo. App. W.D. 1995) (deliberated for two hours and thirty minutes before the hammer instruction). The four hours the jury spent deliberating demonstrate that the hammer instruction was needed to ensure the jury's continued, productive deliberations. Cf. Adkison, 517 S.W.3d at 649–50 (ruling that five hours of deliberation before the hammer instruction was read indicated that the instruction was necessary to encourage further deliberation).

The next factor to consider is the amount of time the jury deliberated after receiving the hammer instruction. Id. at 649. Substantial deliberation after the delivery of the hammer instruction can establish that the verdict was not coerced by the trial court's use of the instruction and that the jury adhered to the instruction's directives. See State v. Copple, 51 S.W.3d 11, 15 (Mo. App. W.D. 2001) (explaining that "if the jury further deliberated a considerable amount of time [after receiving the instruction but] before returning a unanimous verdict, that may indicate that the jury followed the instruction and considered and deliberated upon each other's viewpoints."). In the present case, the jury deliberated for an additional hour and thirteen minutes after receiving the hammer instruction. Missouri courts have noted that similar lengths of post-instruction deliberation did not indicate coercion. See Williams, 409 S.W.3d at 467 (deliberation for one hour and twenty-three minutes after instruction); State v. Garrison, 943 S.W.2d 847, 850 (Mo. App. E.D. 1997) (specifically stating that "the time lapse of one hour and eighteen minutes between the hammer instruction and the guilty verdicts is not indicative of coercion."). The jury's additional deliberation of one hour and thirteen minutes does not evidence a coerced verdict. Cf. Garrison, 943 S.W.2d at 850.

Another important consideration is whether the trial court followed the Notes on Use for MAI-CR 3d 312.10. Adkison, 517 S.W.3d at 649; Williams, 409 S.W.3d at 467. Snider does not suggest that the trial

court failed to follow these guidelines. In accordance with the Notes on Use, the trial court allowed counsel to make objections and arguments before giving the instruction. The trial court also numbered, read, and submitted the instruction to the jury. The record reflects the time that the jury first retired to deliberate, the time the trial court gave the instruction, and the time that the jury returned a verdict. There is no indication, under these circumstances, that the trial court did not comply with any applicable guidelines in delivering the hammer instruction to the jury.

■ The remaining factor is whether the trial court knew numerically how the jury was split and the position of the majority. Adkison, 517 S.W.3d at 649. Even if the trial court knew of a numerical split and the majority's position, this factor alone does not establish coercion. See Williams, 409 S.W.3d at 467 (finding no abuse of discretion where the jury volunteered the numerical split in its notices advising the trial court of the deadlock); Carriker, 342 S.W.3d at 427 (stating that no factor is dispositive). The trial court is not precluded from giving the hammer instruction when the jury, unsolicited by the court, advises the court of the numerical split and the view of the majority. See Williams, 409 S.W.3d at 467; Copple, 51 S.W.3d at 14. Indeed, "[n]o error arises from the judge knowing this information alone when the communication from the jury is unsolicited and voluntarily given to the court." Williams, 409 S.W.3d at 467 (quoting Copple, 51 S.W.3d at 14): see also Dodd, 10 S.W.3d at 553.

The jury deliberated for over four hours before voluntarily submitting a note to the trial court indicating a ten-to-two split, identifying the majority's position, but not in reference to which count or counts. The trial court then complied with the procedural requirements of administering the hammer instruction. The jury engaged in substantial deliberations after the trial court read the instruction. After considering the relevant factors, we find unavailing Snider's argument that the trial court's use of the instruction coerced the jury. To the contrary, the record shows the jury returned a verdict that was a product of its own continued and substantial deliberations. Accordingly, the trial court did not abuse its sound discretion. Point denied.

### Conclusion

The judgment of the trial court is affirmed.

Robert G. Dowd, Jr., J., concurs.

Sherri B. Sullivan, J., concurs.