

# In the
# Missouri Court of Appeals
# Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD83435** |
| | ) | |
| v. | ) | **OPINION FILED:  May 18, 2021** |
| | ) | |
| **LARRY D. RATLIFF,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Clay County, Missouri**
The Honorable Shane T. Alexander, Judge

Before Division Four:  Cynthia L. Martin, Chief Judge, Presiding, Lisa White Hardwick, Judge and W. Douglas Thomson, Judge

Larry D. Ratliff ("Ratliff") appeals from a judgment convicting him of murder in the first degree and armed criminal action.  Ratliff argues that the trial court abused its discretion in allowing a police detective to give a lay witness opinion concerning Ratliff's mental health status during an interview because the jurors were able to form an opinion for themselves when the video of the interview was played for the jury.  Ratliff also argues that the trial court abused its discretion in excluding evidence of his 1988 suicide attempt because the evidence was admissible and relevant, and because Ratliff had no

duty to disclose that anticipated testimony to the prosecution in advance of trial. Finding no prejudicial error, we affirm.

## Factual and Procedural Background

Ratliff does not challenge the sufficiency of the evidence to support his convictions of murder in the first degree and armed criminal action. Viewed in the light most favorable to the verdict,[1] the evidence established that on January 4, 2016, Ratliff killed his wife ("the Victim") by stabbing her four times. Ratliff does not dispute this fact. Instead, he argues that the errors about which he complains on appeal caused the jury to convict him of murder in the first degree instead of murder in the second degree.

Ratliff and the Victim were married for forty-seven years, but they separated in December 2015. After Ratliff and the Victim separated, the Victim stayed at her sister's house. A few days before he killed his wife, Ratliff set fire to the marital home in order to receive the insurance on the home. Ratliff testified that the Victim wanted $80,000, half of the value of the property, in the divorce, and that he intended to pay her this amount from the insurance proceeds. After the house fire, Ratliff stayed in a hotel provided by the insurance company.

After their separation, Ratliff stalked the Victim at her sister's house in the weeks before the murder, and even purchased binoculars to watch her from afar. Ratliff testified that he was careful to conceal his location and identity because he did not want to scare her. On one occasion, he rented a vehicle so she would not recognize his truck.

---

[1]We view the evidence in the light most favorable to the jury's verdict, disregarding all contrary evidence and inferences. *State v. Todd*, 613 S.W.3d 92, 94 n.1 (Mo. App. W.D. 2020). "We mention contrary evidence and inferences only when necessary to provide context for [Ratliff's] claims." *State v. Shaddox*, 598 S.W.3d 691, 693 (Mo. App. S.D. 2020).

Sometimes Ratliff would sit inside of his own truck, parked a distance from the house. On two or three occasions, Ratliff sat inside of a blue truck that was parked in his sister-in-law's backyard.

On the evening of January 3, 2016, Ratliff drove his truck to a location near his sister-in-law's house and sat there for thirty-five minutes. He then went back to his hotel room and wrote a note addressed to his children and grandchildren, which read:

> With all my heart I love each and every one of you. I have such a hole in my heart and soul since your mother left me and I can never be with her again. I cannot live another day or night with this pain that is . . . unbearable[.] [My] soul, my thoughts, my total reason for living. . . . Please try to get along as best you can and love each other without hurting each other. Remember, your mother just lost her heart for me. It's not her fault, but we cannot go on without each other. Love, love, Dad.

At 1:00 a.m. on January 4, 2016, Ratliff drove his truck back to his sister-in-law's house and sat outside for thirty minutes before returning to the hotel.

Later that morning, Ratliff once again drove back to his sister-in-law's house. He testified that he had a meeting planned with the insurance adjuster concerning the house fire that morning, and he wanted to speak with the Victim because her name was on the deed to the house. Ratliff parked his truck at the edge of a field on a highway, approximately a quarter of a mile from his sister-in-law's house. He walked the quarter of a mile distance to his sister-in-law's property through a frozen and muddy bean field, crossing a tree line in order to enter through the backyard of the property. When Ratliff reached the backyard at approximately 6:40 a.m., he sat inside of the blue truck parked in the backyard. Ratliff sat in the truck for approximately two hours, and made several

3

phone calls. Ratliff called his sister-in-law's landline once and her cellphone number twice, but she did not answer.

Ratliff called the Victim's phone at 8:49 a.m. from inside the blue truck. The call lasted approximately four minutes. Ratliff asked if he and the Victim could get back together. The Victim declined and disconnected the call. Ratliff testified that he then walked into the garage and through the kitchen door on the back side of the house. The Victim asked how Ratliff got there and told him to leave. Ratliff slapped the Victim and began beating her while he straddled her on the floor. He eventually took his knife from its sheath on his side and stabbed the Victim four times in the chest. Three of the stab wounds to the Victim's chest were independently fatal wounds. The Victim also suffered abrasions on her forehead and contusions to her scalp.

At 9:04 a.m., Ratliff began placing phone calls. Ratliff called his daughters several times, but they did not answer. He left one of his daughters a voicemail stating that he had killed her mother. At 9:05 a.m., Ratliff called his brother, told him that he had killed the Victim, and his brother instructed him to call 911. At 9:30 a.m., Ratliff called 911.

When police officers arrived, they found Ratliff standing on the driveway. He told police that he killed the Victim by stabbing her in the heart. Officers located the Victim's body on the floor in the kitchen, as well as a pair of gloves and a bloody knife on the table. Ratliff was taken into custody. Later, police found Ratliff's binoculars on the ground outside of the blue truck.

4

On January 6, 2016, Detective Bonita Cannon ("Detective Cannon") and Detective Nick Sola interviewed Ratliff at the Clay County Detention Center. In the interview, which was recorded, Ratliff admitted to killing the Victim and detailed his actions in the weeks leading up to the murder. He told detectives that he stalked the Victim and he described how he beat and stabbed her. Ratliff reported that he had no remorse and that he had been planning to kill the Victim for weeks if she did not agree to reunify their marriage. Ratliff asked for the death penalty. During the interview, Ratliff appeared to be dressed in an anti-suicide smock and he reported that he was on suicide watch at the jail; however, he denied that he was suicidal or that he had mental health issues. He told detectives that he was previously committed, twice, in 2009 to a psychiatric hospital, but again denied that he was suffering from mental health issues at the time of the murder or interview.

Ratliff was charged in the Circuit Court of Clay County, Missouri with murder in the first degree and armed criminal action. At trial, Detective Cannon testified for the State. The prosecutor asked Detective Cannon questions about her interview with Ratliff before the video of the interview was played for the jury. At one point, the prosecutor asked, "In your training and experience in law enforcement, have you encountered individuals who suffer from mental illness or some sort of --." Defense counsel interrupted with an objection, and requested to approach the bench. The following conversation occurred:

> [Defense Counsel]: To give an expert opinion on mental health, I do not believe the detective is able to give such an opinion. I don't believe the detectives with the Kansas City Police Department receive any special

5

training with respect to mental health. I don't believe that she is a licensed psychiatrist or psychologist, and she can't make a diagnosis because she can't, based on the observation over the course of an hour and a half, determine whether Mr. Ratliff was suffering from any mental illness or defect.

[Prosecutor One]: Your Honor, I'm not offering it as an expert's opinion. I'm just asking based on her training and experience if he exhibited any signs of mental health illness or defect, not whether he actually suffered from any.

[Prosecutor Two]: She only made the observations[,] not diagnoses. And it's the kind of question that goes as to whether the confession was voluntary or not. You're asking the jury to make a decision on that.

[Defense Counsel]: This has nothing to do with the voluntariness of the confession. This has everything to do with the statement and attempting to make some kind of declaration by a witness that carries the authority of being a detective that my client was perfectly sane and mentally healthy. What -- signs of what mental illnesses was she observing for? Bipolar? Depression? Anxiety? She can tell all of that just by looking into his eyes during an interrogation? I think that's ridiculous.

[Prosecutor One]: Yeah, that's a routine question that I ask every single time I --

[Trial Court]: Well, I'll allow the one question. Nothing further. And then, [Defense Counsel], you may inquire on cross-examination. Several of the things that you have just stated, I think, would make excellent cross-examination questions.

[Defense Counsel]: Thank you, Judge.

[Trial Court]: All right.

[The proceedings returned to open court.]

[Trial Court]: The objection is overruled. You may proceed.

[Prosecutor One]: In your training and experience in law enforcement, have you encountered individuals who suffer from mental illness or defect?

[Detective Cannon]: Yes.

6

[Prosecutor One]: Did you observe Mr. Ratliff exhibit any signs that he was suffering from any mental disease?

[Detective Cannon]: No.

After a few more questions, the State played the video of the interview for the jury.

Defense counsel then cross-examined Detective Cannon, and inquired into Detective Cannon's mental health training:

[Defense Counsel]: What training have you received as a police officer and detective with the Kansas City Police Department about mental health?

[Detective Cannon]: I was a -- I went to crisis intervention. I was a CIT officer for the Police Department.

[Defense Counsel]: And are you able with that experience to visually diagnose mental illnesses?

[Detective Cannon]: To visually?

[Defense Counsel]: Yes.

[Detective Cannon]: It just depends on the interaction with them.

[Defense Counsel]: So[,] you can look at someone and tell if they are depressed?

[Detective Cannon]: Yes.

[Defense Counsel]: You can look at someone and tell if they are bipolar?

[Detective Cannon]: No.

[Defense Counsel]: You can look at someone and tell if they're suffering from anxiety?

[Detective Cannon]: Yeah.

[Defense Counsel]: You can look at someone and tell if they have psychosis?

7

[Detective Cannon]: By the interaction with them.

[Defense Counsel]: The clothes or the suit that Mr. Ratliff was wearing during your interview with him, are you familiar with what that is?

[Detective Cannon]: He said that's what it was. I don't -- I don't work in detention. I didn't know what it was.

[Defense Counsel]: Did it appear to be a normal uniform that inmates at a detention center would wear?

[Detective Cannon]: I don't know what they wear up here. I don't work in detention.

[Defense Counsel]: Did you obtain releases for Two Rivers and Dr. Peterson from Mr. Ratliff?

[Detective Cannon]: I believe we did, yes.

[Defense Counsel]: Did you obtain medical records from Two Rivers?

[Detective Cannon]: I believe we did.

[Defense Counsel]: Did you obtain medical records from Dr. Peterson?

[Detective Cannon]: I believe we did.

[Defense Counsel]: And are you familiar with what Two Rivers is?

[Detective Cannon]: Yes.

[Defense Counsel]: Is it a psychiatric hospital?

[Detective Cannon]: It was.

[Defense Counsel]: Did -- when you watched the video like we all did, did you notice that there is kind of a first version, and then as Mr. Ratliff retells the story, it sort of -- it's expansive and the language gets a little more colorful? Did you observe that?

[Detective Cannon]: I observed that he was getting frustrated, yes.

8

[Defense Counsel]: And we all just watched it, but he did indicate that he welcomed the death penalty, right, when you interviewed him?

[Detective Cannon]: Yes.

Ratliff testified in his own defense at trial. Ratliff's counsel elicited testimony from Ratliff concerning his mental health in an attempt to establish that Ratliff was suffering from these issues during his interview with detectives, "which resulted in him explicitly confessing to deliberation before killing [the Victim]." Ratliff testified that when he and the Victim separated, he was depressed and he experienced suicidal thoughts and homicidal "urges" toward the Victim. Ratliff stated that he sought help from his family physician, who changed his prescription medications. Ratliff also testified that in 2009, he attempted suicide two times and as a result, he was committed to a psychiatric hospital each time. Ratliff testified that after he killed the Victim, he told his brother and daughter that he intended to commit suicide when police arrived, in that he would "take the knife and run at the police officer . . . [and] have him shoot me," however, they convinced him otherwise. He also testified that he told a judge on the day after the murder to "please move me to the front of the execution line. I want to die." Ratliff said that he agreed to speak with detectives two days after the murder because he "still wanted to die" and that he "said some exaggerating things [to the detectives in order] to get put to death."

During Ratliff's direct examination, defense counsel asked, "[Ratliff], did you have a suicidal episode in 1988 involving a shotgun?" Ratliff responded, "Yes, sir." Defense counsel asked Ratliff to elaborate. Ratliff began, "I was at home. The kids were in school

--." The prosecutor interrupted and asked to approach the bench, where the following conversation occurred:

> [Prosecutor]: This certainly wasn't covered in his police statement. I don't know any relevance to a 2008 [sic] suicide attempt.
>
> [Trial Court]: It was 1988?
>
> [Defense Counsel]: Yeah, it's 1988, Judge.
>
> [Trial Court]: Why -- why are you bringing that up?
>
> [Defense Counsel]: Judge, the only reason he gave that statement to law enforcement that is so damning is because he was suicidal. And I think a lifelong history of suicidal attempts is relevant.
>
> [Trial Court]: Was that disclosed to the State?
>
> [Defense Counsel]: No, Judge.
>
> [Trial Court]: Objection sustained.

Though the trial court sustained the prosecutor's objection, the trial court did not instruct the jury to disregard Ratliff's testimony that he attempted suicide in 1988 with a shotgun.

During his testimony, Ratliff acknowledged that his trial testimony conflicted with his police interview where he expressly stated that he deliberated before killing the Victim. Ratliff testified that he lied to detectives in his interview about deliberating before killing the Victim because he wanted to be put to death.

At the close of the evidence, the jury found Ratliff guilty of murder in the first degree and armed criminal action. Ratliff filed a motion for new trial, and argued, *inter alia*, that the trial court erred in permitting Detective Cannon's testimony concerning his mental health. The motion stated:

10

> This Court erred in allowing [the State], over [Ratliff's] objections, to elicit testimony from [Detective Cannon] that [Ratliff] was not suffering from any mental disease or defect at the time of his interrogation by police. Detective Cannon is not a trained mental health professional. Detective Cannon is not an expert witness. Detective Cannon was improperly allowed to give an opinion on the Defendant's mental state.

The motion for new trial also argued that the trial court erred in excluding Ratliff's testimony regarding his 1988 suicide attempt because his "long history of suicidal behavior and thoughts" was "an essential element of the defense." The trial court denied the motion for new trial, and sentenced Ratliff to life without the possibility of parole for murder and forty years for armed criminal action.

Ratliff appeals.

## Standard of Review

The trial court "has broad discretion to admit or exclude evidence during a criminal trial, and error occurs only when there is a clear abuse of this discretion." *State v. Loper*, 609 S.W.3d 725, 731 (Mo. banc 2020) (quoting *State v. Hartman*, 488 S.W.3d 53, 57 (Mo. banc 2016)). A trial court abuses its discretion when its "ruling admitting or excluding evidence 'is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *Id.* (quoting *State v. Blurton*, 484 S.W.3d 758, 769 (Mo. banc 2016)).

"Our review is for prejudice, not error alone[.]" *State v. Wilson*, 602 S.W.3d 328, 332 (Mo. App. W.D. 2020). This review of potential prejudice depends "upon whether [the] evidentiary error involves the admission or the exclusion of evidence in a criminal

11

trial." *State v. Ellis*, 512 S.W.3d 816, 825 (Mo. App. W.D. 2016). Where a trial court errored in ***admitting*** evidence, the error is prejudicial "if the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error." *Id.* (quoting *State v. Miller*, 372 S.W.3d 455, 472 (Mo. banc 2012)). Whereas, "the erroneous ***exclusion*** of evidence in a criminal case creates a rebuttable presumption of prejudice" and "[t]he [S]tate may rebut this presumption [of prejudice] by proving that the error was harmless beyond a reasonable doubt." *Id.* (quoting *Miller*, 372 S.W.3d at 472).

## Analysis

Ratliff asserts two points on appeal. Ratliff's first point on appeal contends that the trial court abused its discretion when it permitted Detective Cannon to provide a lay witness opinion on a matter the jurors were capable of observing themselves. Ratliff's second point on appeal argues that the trial court abused its discretion when it excluded evidence about his 1988 suicide attempt because the evidence was relevant and the defense did not have a duty to disclose the evidence to the State in advance of trial. With respect to both points, Ratliff argues that he was prejudiced because the errors caused the jury to find that he deliberated before killing the Victim, resulting in his conviction of murder in the first degree. We address these points separately.

### *Point One*

Ratliff's first point on appeal asserts that "the trial court abused its discretion when it permitted the State to question Detective Cannon as to her opinion of whether Mr.

Ratliff was suffering from mental health issues" because this was an improper lay opinion since the video of the interview was played for the jury and the jurors could form their own conclusions based on their observations of Ratliff. Ratliff argues that the "sole issue" at trial was whether Ratliff deliberated upon the murder of the Victim as to support a conviction of murder in the first degree, or whether deliberation was absent so that the jury could only find Ratliff guilty of murder in the second degree.[2] *See State v. Ward*, 473 S.W.3d 686, 694 n.6 (Mo. App. W.D. 2015) ("The element of deliberation sets first-degree murder apart from other forms of homicide. . . ." (citing *State v. O'Brien*, 857 S.W.2d 212, 217-18 (Mo. banc 1993))). Ratliff testified at trial that his statement to detectives about deliberating before killing the Victim was a "mixture of truth and lies," and that the jury should believe his testimony at trial because during his interview, he "said some exaggerating things to get put to death" because he was severely depressed, wanted to die and he hoped that he would be executed for the murder. Ratliff argues on appeal that Detective Cannon's improper lay opinion that Ratliff was not experiencing mental health issues during his police interview was therefore highly prejudicial.

Ratliff's claim of error on appeal is not preserved for our review. In order to preserve an error for appellate review, "an objection stating the grounds must be made at trial, [and] the same objection must be set out in the motion for new trial and must be carried forward in the appellate brief[.]" *State v. Mosely*, 599 S.W.3d 236, 242 (Mo. App. W.D. 2020) (quoting *State v. Walter*, 479 S.W.3d 118, 123 (Mo. banc 2016)). At

---

[2]The jury was instructed to consider the following lesser included offenses, in the event that it did not find Ratliff guilty of murder in the first degree: second degree murder, voluntary manslaughter, and involuntary manslaughter in the first and second degree. However, Ratliff concedes that the evidence set forth at trial supported a verdict for murder in the second degree.

trial, Ratliff objected that Detective Cannon was not qualified to give an expert witness opinion concerning Ratliff's mental health status during the interview. Ratliff's counsel argued:

> To give an *expert opinion* on mental health, I do not believe the detective is able to give such an opinion. I don't believe the detectives with the Kansas City Police Department receive any special training with respect to mental health. I don't believe that she is a licensed psychiatrist or psychologist, and *she can't make a diagnosis* because she can't, based on the observation over the course of an hour and a half, determine whether Mr. Ratliff was suffering from any mental illness or defect.
>
> . . . .
>
> . . . This has everything to do with the statement and attempting to make some kind of declaration by a witness that carries the authority of being a detective that my client was perfectly sane and mentally healthy. What -- signs of what mental illnesses was she observing for? Bipolar? Depression? Anxiety? She can tell all of that just by looking into his eyes during an interrogation? I think that's ridiculous.

(Emphasis added.) Ratliff's counsel never objected that Detective Cannon's testimony would constitute an improper lay opinion on an issue the jury could determine for themselves. And, Ratliff's motion for new trial alleged only that the trial court erred in permitting Detective Cannon's answer because she was "not a trained mental health professional" and "not an expert witness" and therefore she was "improperly allowed to give an opinion on [Ratliff's] mental state." Because the objection registered at trial, and the claim of error raised in the motion for new trial, are not the same as the error now claimed in Ratliff's point on appeal, the assertion that Detective Cannon was improperly permitted to give a lay opinion about a matter the jurors could determine on their own is

14

not preserved for our review and is subject, at best, to plain error review. *See Mosely*, 599 S.W.3d at 242.

"Under plain error review, we must determine whether the alleged error is 'evident, obvious, and clear error' that 'facially establishes substantial grounds for believing that manifest injustice or a miscarriage of justice' has occurred." *State v. Campbell*, 600 S.W.3d 780, 788-89 (Mo. App. W.D. 2020) (quoting *State v. Ellis*, 538 S.W.3d 335, 337 (Mo. App. W.D. 2017)). This requires a showing by Ratliff that "the error was outcome determinative." *State v. Wood*, 580 S.W.3d 566, 579 (Mo. banc 2019) (quoting *State v. Baxter*, 204 S.W.3d 650, 652 (Mo. banc 2006)).

It is true that "[a]n ordinary lay witness generally may not testify regarding the witness's opinion on a matter in dispute because . . . the jury and lay witness are [usually] in equal positions to form an accurate opinion." *State v. Callaghan*, 564 S.W.3d 339, 344 (Mo. App. W.D. 2018) (quoting *State v. Starkey*, 380 S.W.3d 636, 647 (Mo. App. E.D. 2012)). "Generally, a lay witness must state facts from which the jury forms an opinion and may not testify regarding his or her opinion on a matter in dispute." *State v. Hutson*, 487 S.W.3d 100, 107 (Mo. App. W.D. 2016) (citation omitted).

There are exceptions to this general rule. One exception is that a lay witness may "provide an opinion if the witness possesses knowledge that is not available to the jury and that would be helpful to the jury to determine a disputed issue." *Id.* at 107–08 (citing *Starkey*, 380 S.W.3d at 647). In addition, a lay witness who "personally observed the events, [] is permitted to testify as to his 'comprehension of what he has seen in a descriptive manner' even if that testimony contains 'a conclusion, opinion or inference, if

15

the inference is common and accords with the ordinary experiences of everyday life.'" *State v. Langford*, 455 S.W.3d 73, 76 (Mo. App. S.D. 2014) (quoting *State v. Strong*, 142 S.W.3d 702, 716 (Mo. banc 2004)). That is, "[a]n observer is permitted to state natural inferences from observed conditions or occurrences or the impression made on his mind by a number of connected facts whose detail cannot be placed before the jury." *Id.* (quoting *Shockley v. State,* 147 S.W.3d 189, 194 (Mo. App. S.D. 2004)).

Ratliff acknowledges these exceptions, but argues they do not apply when the facts from which a lay opinion is drawn can be effectively presented to the jury to permit the jury to draw its own impressions. Since Detective Cannon provided a lay opinion based on what she observed during the video interview, and since the video interview was played for the jury, Ratliff argues that the exceptions to the general rule prohibiting lay opinion testimony are inapplicable.

We need not resolve whether the trial court's decision to permit the State to ask Detective Canon about whether she observed signs of mental illness during Ratliff's interview was evident, obvious, and clear error in the admission of an improper lay opinion. Even if it was, Ratliff has not demonstrated that the purported error "'facially establishes substantial grounds for believing that manifest injustice or a miscarriage of justice' has occurred." *Campbell*, 600 S.W.3d at 788-89 (quoting *Ellis*, 538 S.W.3d at 337). The trial court only permitted the State to ask a single question of Detective Cannon about whether she observed that Ratliff was exhibiting signs suggesting he was suffering from a mental issue. The State did not emphasize or refer to Detective

16

Cannon's testimony at any other time during the trial.[3]  The jury watched the video of the interview, where Ratliff appeared to be dressed in an anti-suicide smock, and he stated that he was on suicide watch.  The jury heard Ratliff's trial testimony that he lied during the interview because he wanted to receive the death penalty, that Ratliff attempted suicide in 1988 and twice in 2009, and that Ratliff was twice committed to a psychiatric hospital.  The jury considered Ratliff's testimony at trial that in the weeks before the murder, he sought help for his depression and suicidal and homicidal thoughts.  Finally, the jury heard Ratliff's testimony that he told his daughter and brother that he planned on killing himself shortly after the murder, that he told the judge the day after the murder that he wanted to be moved "to the front of the execution line," and that Ratliff stated he agreed to speak with detectives because he wanted to die.

After viewing the video interview, and hearing all of the evidence, including evidence of Ratliff's trial testimony about his purported mental illness at the time of the interview, the jury nonetheless found that Ratliff deliberated before killing the Victim by finding him guilty of murder in the first degree.  The record does not permit a conclusion that the jury reached this conclusion because Detective Cannon testified that she observed

---

[3]Ratliff also argues that during defense counsel's cross-examination of Detective Cannon, she "maintained that through her experience and training as a detective she could tell by looking whether someone was suffering from mental illness" and that her testimony improperly carried "a professional real-world cachet on which the jury would rely."  As we have indicated, the record reflects that the State did not elicit testimony from Detective Cannon concerning her opinion of Ratliff's mental health diagnosis, rather, the State inquired about Detective Cannon's observations of any signs which could indicate he was suffering from a mental disease.  It was during cross-examination when *defense counsel asked Detective Cannon whether she could "visually diagnose mental illnesses"* and Detective Cannon responded that she could, during certain interactions.  Thus, the evidence underpinning Ratliff's claim that Detective Cannon concluded that Ratliff was not suffering from a mental health issue during the interview was adduced by Ratliff himself on cross-examination, rather than the State.  "It is axiomatic that a defendant may not take advantage of self-invited error or error of his own making." *State v. Schachtner*, 611 S.W.3d 885, 895 (Mo. App. S.D. 2020) (quoting *State v. Brandolese*, 601 S.W.3d 519, 531 (Mo. banc 2020)).  "[Ratliff] cannot now complain that his chosen method of impeachment constituted an improper bolstering of the State's case." *See State v. Johnson*, 477 S.W.3d 218, 226 (Mo. App. W.D. 2015).

17

no signs suggesting that Ratliff was suffering from a mental issue during his interview. *See State v. Minner*, 256 S.W.3d 92, 98 (Mo. banc 2008) (officer's testimony that identified defendant in surveillance tapes did not result in manifest injustice where the jury viewed the tapes and concluded that defendant was the man in the tapes, and "[there was] no indication the jury could not identify [defendant] from the videos or that [the officer's] testimony interfered with the jury's independent identification"). Rather, it is plausible, even likely, that the jury rejected Ratliff's trial testimony about lying during his interview because, after watching the interview for themselves, the jury did not believe Ratliff appeared to be suffering from a mental issue during the interview.

Moreover, even if the jury believed Ratliff's testimony that he was lying during his video interview when he told detectives he deliberated before killing the Victim, the jury could have found that Ratliff deliberated before killing the Victim based on other evidence. Putting aside Ratliff's video interview, Ratliff's trial testimony, coupled with other evidence admitted at trial, established that Ratliff had homicidal "urges" toward the Victim and had stalked her in the weeks before the killing. The evening before the murder, Ratliff left a note addressed to his children and grandchildren which stated, in part, "I have such a hole in my heart and soul since your mother left me and I can never be with her again . . . we cannot go on without each other." On the morning of the killing, Ratliff parked his truck where the Victim could not see it, and walked a quarter of a mile, through a frozen and muddy field with the knife on his belt. When he reached a spot in the backyard where he could view the Victim but he was still out of sight, Ratliff called his sister-in-law, and after she did not answer, he phoned the Victim, who rejected

18

him and abruptly ended the phone call. Ratliff then walked through the backyard and garage and into the kitchen, without knocking. He slapped the Victim and proceeded to beat her while pinning her onto the floor before he stabbed her four times. Ratliff did not immediately seek help until his brother told him to call 911, at least twenty-five minutes after stabbed the Victim. Whether the jury believed Ratliff was lying about deliberation during his video interview or not, other substantial evidence supports the conclusion that Ratliff deliberated before killing the Victim. *See State v. Shaddox*, 598 S.W.3d 691, 696 (Mo. App. S.D. 2020) ("Evidence of multiple stab wounds, repeated blows, the failure to seek medical help, . . . ample opportunity to stop the attack, or that the defendant brooded over his actions before taking them can support an inference of deliberation." (quoting *State v. Olivas*, 431 S.W.3d 575, 580 (Mo. App. W.D. 2014))). As such, error, if any, associated with the admission of Detective Cannon's lay opinion testimony did not result in manifest injustice because it was not outcome determinative given other overwhelming evidence that Ratliff deliberated before killing the Victim.

Point One is denied.

***Point Two***

Ratliff's second point on appeal argues that the trial court abused its discretion in excluding evidence of Ratliff's 1988 suicide attempt because the evidence "was legally relevant to his defense that his confession was false and made under a cloud of mental distress and suicidal feelings" and because Ratliff had no affirmative duty to disclose the testimony to the State.

19

"Because a defendant in a criminal case has a constitutional right to present a complete defense, 'the erroneous exclusion of evidence in a criminal case creates a rebuttable presumption of prejudice.'" *State v. Taylor*, 588 S.W.3d 632, 637 (Mo. App. W.D. 2019) (quoting *Ellis*, 512 S.W.3d at 825). "The [S]tate may rebut this presumption [of prejudice] by proving that the error was harmless beyond a reasonable doubt." *Id.* (quoting *Ellis*, 512 S.W.3d at 825). "In assessing whether the exclusion of evidence was harmless beyond a reasonable doubt, the facts and circumstances of the particular case must be examined, including the nature of the charge, the evidence presented, and the role the excluded evidence would have played in the defense's theory." *State v. Watt*, 531 S.W.3d 540, 550 (Mo. App. W.D. 2017) (quoting *Ellis*, 512 S.W.3d at 825).

The premise of Ratliff's second point on appeal is flawed. Ratliff answered "yes" when asked, without objection, whether he had attempted suicide in 1988 with a shotgun. The State objected to the next question, which asked Ratliff to elaborate about the 1988 suicide attempt. The trial court sustained this objection, but was not asked to strike Ratliff's unopposed testimony affirming that he had attempted suicide in 1988. As a result, the jury heard, and could properly consider, Ratliff's testimony that he attempted suicide in 1988. All that was excluded from the evidence were the extraneous details about the 1988 suicide attempt.

The State argues that Ratliff failed to preserve any claim of error associated with excluding evidence of the extraneous details of his 1988 suicide attempt because he did not make an adequate offer of proof about the excluded evidence at trial. We agree. In order "[t]o preserve a claim of improperly excluded evidence, the proponent must attempt

20

to present the excluded evidence at trial and, if it remains excluded, make a sufficient offer of proof." *State v. Hunt*, 451 S.W.3d 251, 263 (Mo. banc 2014) (citing *Hancock v. Shook*, 100 S.W.3d 786, 802 (Mo. banc 2003)). "The purpose of an offer of proof is to preserve the evidence so the appellate court 'understands the scope and effect of the questions and proposed answers.'" *Id.* (quoting *State v. Tisius,* 92 S.W.3d 751, 767–68 (Mo. banc 2002)). An offer of proof "must show what the evidence will be, the purpose and object of the evidence, and each fact essential to establishing admissibility[,]" and it must be specific and definite. *Id.* (citations omitted).

Here, in response to the State's objection after Ratliff was asked to describe the details surrounding his 1988 suicide attempt, Ratliff responded only that "the only reason [Ratliff] gave that statement to law enforcement that is so damning is because he was suicidal. And I think a lifelong history of suicidal attempts is relevant." This is not an adequate offer of proof regarding the details of the 1988 suicide attempt. If anything, counsel's argument only supports permitting the jury to know about the earlier suicide attempt. By the time of the State's objection, the jury had already heard about the 1988 suicide attempt, and was never asked to ignore that testimony. Beyond a general contention that evidence of a suicide attempt in 1988 was relevant to establish a lifelong history of suicide attempts, Ratliff never explained to the trial court what more he wanted to elicit from Ratliff about the 1988 suicide attempt, or how the extraneous details would have furthered Ratliff's contention that he suffered a lifelong history of suicidal ideations.

We will not indict the trial court for excluding unspecified evidence that was never presented to the trial court by an adequate offer of proof. [4]

Even if we could find (which we do not) that the trial court erroneously excluded evidence of the extraneous circumstances surrounding Ratliff's 1988 suicide attempt, we would not find the error to be prejudicial. In the face of overwhelming evidence of guilt, the State is deemed to have rebutted the presumption of prejudice associated with the erroneous exclusion of evidence offered by a defendant in a criminal proceeding. *State v. Barriner*, 111 S.W.3d 396, 401 (Mo. banc 2003) ("If the proof of defendant's guilt was overwhelming, the [S]tate will have rebutted the presumption of prejudice." (citation omitted)). Ratliff confessed to killing the Victim. The only issue in dispute at trial was whether he deliberated before doing so. As addressed in connection with Ratliff's first point on appeal, even without considering Ratliff's interview with detectives, there was overwhelming evidence from which the jury could have concluded that Ratliff deliberated before killing the victim.

In addition, "[t]he exclusion of evidence is harmless beyond a reasonable doubt where the excluded evidence is cumulative of other evidence which was admitted at trial." *Taylor*, 588 S.W.3d at 637 (quoting *Ellis*, 512 S.W.3d at 825). Here, the excluded testimony about the specific circumstances of Ratliff's 1988 suicide attempt would not have added anything of import to all of the other evidence admitted at trial regarding Ratliff's mental health and suicidal tendencies. The jury heard that Ratliff attempted

---

[4]It is thus irrelevant whether the trial court granted the State's objection on the basis of relevance, or (as argued by Ratliff on appeal) because the State also argued that the circumstances of the 1988 suicide attempt were not disclosed to the State in advance of trial.

22

suicide and was committed to a psychiatric hospital, twice, in 2009; that Ratliff sought medical help for his suicidal and homicidal thoughts in the weeks before the murder; that Ratliff told his brother and his daughter that he planned to commit suicide after killing the Victim; that Ratliff told a judge he wanted to be executed for the murder; that Ratliff testified that he spoke to detectives two days after the murder because he still wanted to die; that during his interview with the detectives, Ratliff wore an anti-suicide smock and reported that he was on suicide watch at the jail; and that Ratliff attempted suicide, with a shotgun, in 1988. The extraneous circumstances of the 1988 suicide attempt would have been cumulative, at best, of all of the other suicidal ideation evidence heard and considered by the jury. Therefore, any error associated with the trial court's exclusion of Ratliff's testimony was harmless.

The trial court did not abuse its discretion in excluding Ratliff's testimony concerning the extraneous circumstances of his 1988 suicide attempt. Point Two is denied.

### Conclusion

The trial court's judgment of conviction and sentence is affirmed.


_____
Cynthia L. Martin, Judge

All concur

23